UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF JOANN MATOUK
ROMAIN and MICHELLE MARIE ROMAIN,

          Plaintiffs,

                                      Civil Case No. 14-12289

v.                                 Honorable Linda V. Parker

THE CITY OF GROSSE POINTE FARMS,
DANIEL JENSEN, HOLLY KRIZMANICH,
JACK PATTERSON, ANDREW ROGERS,
RICHARD A. ROSATI, MICHAEL MCCARTHY,
KEITH COLOMBO, ANTONIO TRUPIANO,
GEOFFREY MCQUEEN, WELSEY KIPKE,
JOHN WALKO, FRANK ZIELINSKI, RICKY
GOOD, THE CITY OF GROSSE POINTE
WOODS, ANDREW PAZUCHOWSKI, JOHN
KOSANKE, JOHN ROSS, KEITH WASZAK,
DENNIS WALKER, MARTIN MITCHELL,
ANTHONY CHALUT, OFFICER JOHN DOE,
TIMOTHY J. MATOUK, JOHN DOE, and
KILLER JOHN DOE,

          Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS [ECF NOS. 77, 82]

On January 12, 2010, an officer from the City of Grosse Pointe Farms Police

Department came to the home of JoAnn Matouk Romain ("Ms. Romain"), asking

if Ms. Romain was missing.  The officer claimed that Ms. Romain's vehicle had

been found in a church parking lot and the police believed she had committed

1

suicide by walking into the frozen lake across the road.  Claiming that she in fact

was murdered and that Defendants conspired to cover up the murder, Ms.

Romain's estate, through its personal representative Michelle Marie Romain, filed

this lawsuit on June 10, 2014.  Plaintiffs filed an Amended Complaint on July 16,

2014, in which they assert the following claims against Defendants: (I) denial of

right of access to the courts under 42 U.S.C. § 1983; (II) conspiracy to deny

Plaintiffs their constitutional rights under 42 U.S.C. § 1985; (III) "state created

danger" under 42 U.S.C. § 1983; (IV) violation of the Freedom of Information Act

("FOIA"); (V) spoliation of evidence; (VI) violations of substantive and procedural

due process and the Fair and Just Treatment Doctrine under the Michigan

Constitution; (VII) municipal liability under 42 U.S.C. § 1983; and (VIII) wrongful

death.

On October 17, 2014, Defendant Timothy J. Matouk filed a motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative,

for a more definite statement under Rule 12(e).  (ECF No. 77.)  A motion to

dismiss and joinder in Defendant Matouk's motion was filed on December 4, 2014

by the following defendants associated with the City of Grosse Pointe Woods

and/or its police department: the City of Grosse Pointe Woods ("Grosse Pointe

Woods"); Sargent and Director of Public Safety Andrew Pazuchowski; Lieutenant

John Kosanke; Lieutenant John Ross; and Public Safety Officers Keith Waszak,

Dennis Walker, Martin Mitchell, and Anthony Chalut (collectively "Grosse Pointe Woods Defendants").[1]  (ECF No. 82.)  The motions have been fully briefed.  On December 14, 2014, the Court issued a notice informing the parties that it is dispensing with oral argument with respect to the motions.

## I.    Factual Background

According to Plaintiffs' Amended Complaint, at 9:25 p.m. on January 12, 2010, Officer John Doe from the City of Grosse Pointe Farms Police Department, came to Ms. Romain's home, where she resided with her three children.  (Am. Compl. ¶ 35; *see also* ECF No. 80-5 ¶ 2.)  Michelle Romain ("Michelle"), Ms. Romain's daughter, answered the door.  (Am. Compl ¶ 35.)  The officer asked Michelle if her mother was missing; Michelle responded that, to her knowledge, no.  (*Id*.) Michelle and her siblings had been with Ms. Romain at 5:00 p.m. that day and Ms. Romain then went to attend services at St. Paul Catholic Church on Lakeshore Drive in the City of Grosse Pointe Farms ("Grosse Pointe Farms").  (*Id*. ¶¶ 49e, 61.)

The officer proceeded to inform Michelle that Ms. Romain's car had been found in the church parking lot during a routine patrol which had caused the patrolling officers to become concerned and investigate.  (*Id*. ¶ 35.) He indicated

---

[1] The remaining named defendants, who are associated with the City of Grosse Pointe Farms, have filed answers to Plaintiffs' Amended Complaint.

3

that officers were at the scene, searching for clues regarding Ms. Romain's disappearance, and that Michelle and her family should stay at the residence. (Am. Compl. ¶ 36.)  Michelle and her two siblings decided, instead, to drive to the church.  (*Id*. ¶ 37.)  There, they saw the Lexus vehicle that Ms. Romain had been driving surrounded with police caution tape.  (*Id*.) The police were attempting to gain entry into the locked vehicle.  (*Id*.) This was at approximately 10:00 p.m. (*Id*.)

Prior to this time, the United States Coast Guard had been contacted and divers were in the process of searching the lake across the road from the church for Ms. Romain.  (*Id*.)  When Michelle asked why the police were searching the water, she was told that footprints led from the Lexus down the church driveway, across the street, and down to the lake.  (*Id*. ¶ 38.) Ms. Romain's family asked the police to bring K-9 units to the scene to track Ms. Romain's scent; however, the officers advised that dogs cannot detect scent in the cold.  (*Id*. ¶ 39.) Ms. Romain's family subsequently learned that this is not true.  (*Id*.)

After several hours searching for Ms. Romain in the lake, the search was called off for the evening.  (*Id*. ¶ 40.)  The search continued the following day, without locating Ms. Romain's body.  It was discovered by two fishermen in Amherstburg, Ontario, Canada more than two months later on March 20, 2010. (*Id*. ¶ 42.)  They contacted the Ontario Police.  (*Id*.)

4

Defendants Michael McCarthy and Richard Rosati of the Grosse Pointe Farms Police Department "immediately rushed over to Canada" and told the Ontario police that Ms. Romain was ' "extremely paranoid, suffered from severe mental health issues' and that 'no foul play was suspected.' " (*Id*.) The police supposedly obtained the information concerning Ms. Romain's mental state through an anonymous tip. (*Id*. ¶ 47.) It was later discovered and confirmed through phone records that the tip had come from Defendant Matouk. (*Id*.) Defendants McCarthy and Rosati also told the Ontario police that Ms. Romain had committed suicide. (*Id*. ¶ 42.) A coroner in Ontario performed an autopsy and found nothing strange about Ms. Romain's body or her clothing. (*Id*. ¶ 44.)

Michelle had an autopsy performed by the head of forensic pathology at the University of Michigan Hospital, who found contusions on Ms. Romain's upper left arm where she carried her purse. (*Id*. ¶ 45.) Ms. Romain's purse had been found inside her locked vehicle with a portion near the handle visibly torn, as if it were grasped in a struggle. (*Id*.) The forensic pathologist also noted that Ms. Romain's boots appeared to be brand new with absolutely no scuff marks. (*Id*.) Ms. Romain needed to walk down a very steep cement embankment and over at least several hundred feet of rocks and boulders by the water's edge to gain access to the lake across from the church. (*Id*.) Further increasing her families' doubt that Ms. Romain committed suicide by walking into the lake by the church was the

5

fact that her body would have had to float over thirty miles in nine weeks, in what Plaintiffs' allege was a mostly frozen lake which had virtually zero current, to reach the location where it was found by the fishermen. (*Id*. ¶ 43.) Other facts led Ms. Romain's family to believe that she was murdered and that the police were involved in a conspiracy to cover up her murder.

Several weeks before her disappearance, Ms. Romain received a call from her cousin, Defendant Matouk. (*Id*. ¶ 46.) Michelle and her sister were present when Ms. Romain received the call. (*Id*.) They found it strange that Defendant Matouk was calling, as Ms. Romain had not spoken to her cousin in at least ten years. (*Id*.) Ms. Romain and Defendant Matouk spoke for some time and their conversation turned into an argument. (*Id*.) According to her daughters, Ms. Romain suddenly turned white and she hung up the phone. (*Id*.) She then turned to Michelle and told her that if anything happened to her or if she went missing, Michelle should tell the police to investigate Defendant Matouk, who was employed at the time as a police officer for the City of Harper Woods. (*Id*.) Michelle and her sister met with Defendants McCarthy and Rosati on January 14, 2010 (two days after Ms. Romain's disappearance) and told them about this incident.[2] (*Id*.)

---

[2] Although not contained in the Amended Complaint, in affidavits submitted in support of Plaintiffs' response to the pending motions, Ms. Romain's sister and
(Cont'd . . .)

On the same date, the Grosse Pointe Farms Police Department turned its investigation of Ms. Romain's disappearance over to the Grosse Pointe Woods Police Department.  (*Id*. ¶ 48.)  Seventy days later, the Grosse Pointe Woods Police Department changed its investigation to "open but inactive."  (*Id*.)  After Michelle pleaded to have the case re-opened and the case made national headlines on television, the Grosse Pointe Woods Police Department indicated that the investigation had been turned back over to Grosse Pointe Farms.  (*Id*.)  Michelle decided to hire her own lawyers and investigators to investigate Ms. Romain's death.  (*Id*. ¶ 49.)

The lawyers immediately submitted requests for information and police reports on behalf of Ms. Romain's estate and Michelle under FOIA.  (*Id*.)  The requests went ignored by the Grosse Pointe Woods and Grosse Pointe Farms police

---

children state that Ms. Romain had shared her concern that Defendant Matouk was going to harm her with many of her friends and other relatives. (ECF No. 80-3 ¶ 11; ECF No. 80-4 ¶¶ 6, 7; ECF No. 80-5 ¶¶ 6, 7; ECF No. 80-6 ¶¶ 6, 7.) According to the affiants, at least five of those individuals, in addition to Ms. Romain's children, told the police after her disappearance that Defendant Matouk should be a person of interest in their investigation.  (*Id*.)  Ms. Romain's children also state in their affidavits that Ms. Romain told them a few days after the phone call from Defendant Matouk that there was something very serious that was troubling her and she felt she needed to speak to the authorities about it, but was reluctant to go to local police due to Defendant Matouk's relationship with many Grosse Pointe Farms and Grosse Pointe Woods police officers.  (ECF Nos. 80-4 ¶ 5, 80-5 ¶ 5; 80-6 ¶ 5.)  She agreed instead to schedule an appointment with the FBI.  (*Id*.)  She refused to tell her children any details about what she knew, claiming fear for their safety.  (*Id*.)

departments.  (*Id.*)  Michelle therefore filed a FOIA lawsuit on behalf of herself

and the estate and the judge in that case subsequently ordered the defendants to

turn over the requested documents.  (*Id.*)  Through these documents, Plaintiffs

discovered that the LEIN check on the vehicle Ms. Romain was driving the night

she disappeared-- which allegedly led the police to her home to ask about her

whereabouts-- was run after 10:00 p.m.  (*Id.* ¶ 49a.)  This was over a half hour

*after* the police officer arrived at the home.  Additionally, the automobile was not

registered in Ms. Romain's name and thus it is unclear why the police would have

been looking for her based on finding the car.  (*Id.*)

Additionally, there were no footprints on the driveway or the street leading

from the church to the lake, which photographs showed were dry that evening.  (*Id.*

¶ 49c.)  The only footprints found were in the snow and those prints had been made

by someone with feet much larger than Ms. Romain's size five foot, wearing an

athletic or business attire shoe rather than the high-heels Ms. Romain was wearing

that evening.  (*Id.*) The police never compared those footprints to Ms. Romain's

feet or the boots she was wearing once her body was recovered.  (*Id.*) The police

also never tested the vehicle or Ms. Romain's purse for possible DNA or

fingerprint evidence.  (*Id.* ¶ 49d.)

Michelle was informed that the police had dusted for and processed a

fingerprint analysis of the vehicle; however, no documentation of any analysis was

8

ever turned over to Ms. Romain's family.  (*Id.*)  When the family's independent

investigator questioned Defendants regarding the possibility of prints being found

inside the vehicle, he was informed that " '[t]he only fingerprints that were

collected from the vehicle were that of JoAnn and her children.' "  (*Id.*)  Neither

Ms. Romain's nor her children's fingerprints, however, were on file at that time.

(*Id.*)  The police also informed the U.S. Coast Guard that Ms. Romain had been

missing since 5:00 p.m. that day, when in fact nobody had reported Ms. Romain

missing and her family had been with her at that time.  (*Id.* 49e.)  Additionally,

several witnesses provided statements to the police that were ignored or edited to

support their suicide theory.

Ms. Romain's friends, family, doctors, and the staff at her attorney's office

informed the police that she was neither depressed nor suicidal.  (*Id.* ¶ 50.)  They

also told the police that Ms. Romain was a devout Catholic who took an absolute

stand against suicide.  (*Id.*)  The last person to leave St. Paul Church on the night

of Ms. Romain's disappearance told the police that when she left at approximately

7:45 p.m., Ms. Romain's vehicle was not in the driveway of the church where it

was later supposedly found by the police.  (*Id.* ¶ 51.) Two church members

informed the police that they saw Ms. Romain's car alarm go off for at least ten

seconds while they were exiting the church after services.  (*Id.* ¶ 52.)  The day after

Ms. Romain's disappearance, a woman contacted Defendant McCarthy and stated

9

that she had seen a six-foot tall, medium built man, dressed in all black standing near the lake around the time Ms. Romain went missing.  (*Id*. ¶ 55.)  The woman's statement, however, was changed to say that she saw a woman standing near the lake.  (*Id*.)  Another witness also reported seeing a man walking in a strange manner on Lakeshore Drive near the church at approximately 8:25 p.m. that evening.  (*Id*. ¶ 63.)  As the witness drove past the man, she looked in her rear view mirror and saw him crossing over to the church.  (*Id*.)  This witness returned to the scene the next morning, where the divers were continuing to search for Ms. Romain, and tried to tell the police what she had seen, but they would not listen to her.  (*Id*.)  She also called the Grosse Pointe Woods Police Department, but nobody would take her statement.  (*Id*.)

A police report entered by Defendant Anthony Trupiano on January 13, 2010, makes reference to evidence found at the scene of Ms. Romain's disappearance.  (*Id*. ¶ 64.)  Two items mentioned are Ms. Romain's purse and a scarf that was found in the street across from the church.  (*Id*.)  The scarf was never tested for DNA evidence nor turned over to Ms. Romain's family.  (*Id*.)  Its present whereabouts are unknown to Plaintiffs.  (*Id*.)

Another witness, an employee of a school located directly next to the church who was the last person to leave the school the evening Ms. Romain disappeared, reported to the police that she saw a suspicious white Mercedes SUV parked next

10

to the church the night of her disappearance. (*Id*. ¶ 56.) This witness also reported that as she was leaving the school's parking lot, she saw a man walking strangely along Lakeshore Drive near the church, wearing a scarf but no coat, which she found odd because he did not appear to be exercising and the weather was cold. (*Id*.)

Defendant John Ross entered a police report on January 17, 2010, which included a witness statement from a retired Federal Bureau of Investigations ("FBI") Agent and friend of Ms. Romain's. (*Id*. ¶ 59.) This witness told the police that Defendant Matouk and David Romain (Ms. Romain's husband from whom she was in the process of finalizing a divorce) should be people of interest with respect to her disappearance. (*Id*.) Michelle also told the police that the same two individuals should be considered people of interest. (*Id*.) Plaintiffs claim that the police never investigated Defendant Matouk and the only information obtained from David Romain involved his banking and financial information and a polygraph report that was never turned over to Ms. Romain's family. (*Id*.)

Elizabeth Fisher, a woman attending the church service the evening of Ms. Romain's disappearance, contacted the police and informed Defendant John Kosanke that she saw Ms. Romain leaving the church around 7:20 p.m. (*Id*. ¶ 61.) Ms. Fisher also told Defendant Kosanke that one of her friends later told her that she witnessed Ms. Romain's panic alarm on her car go off for approximately ten

11

seconds (which had also been reported by another witness).  (*Id*.)  The report

entered by Defendant Kosanke states that Ms. Fisher also reported that Ms.

Romain's body language indicated that she was depressed.  (*Id*.)  Ms. Fisher

reported no such thing, however.  (*Id*.)  The report also states that Ms. Fisher

claimed that what her friend had seen and heard was not a panic alarm, but the

audible chirps made when the car doors are locked.  (*Id*.)  Ms. Fisher never said

this either, however.  (*Id*.)

On January 18, 2010, Paul Hawk went to the Grosse Pointe Farms police

department and met with Defendant Daniel Jensen and two other police offers for

about forty minutes to share what he had seen while driving on Lakeshore Drive

near St. Paul Catholic Church the night of Ms. Romain's disappearance.  (*Id*. ¶ 53.)

The officers told Mr. Hawk to go home, put his statement in writing, and bring it

back the next day, which he did.  (*Id*.)  According to Mr. Hawk's statement, which

he gave to the police on January 19, 2010, while driving on Lakeshore Drive near

St. Paul Church the evening of January 12, he observed a woman with dark hair

and black clothing sitting on the break-wall of Lake Saint Claire.[3]  (*Id*.)  He also

---

[3] Although not stated in Plaintiffs' Amended Complaint, Mr. Hawk states in an affidavit attached to Plaintiffs' response brief that he made these observations between 7:30 and 8:00 p.m.  (ECF No. 80-7 ¶ 2.)  Mr. Hawk provides that he based the time-frame on the fact that he had been hurrying to finish his grocery shopping because he thought the store closed at 7:00, when in fact it closed at 8:00.  (*Id*.¶ 15.)

observed two cars parked illegally on the lake side of the road with two men standing near them and he gave a detailed description of both men. (*Id*.) He also described one of the vehicles as a dark blue or black four-door sedan which appeared to be a municipal vehicle. (*Id*.) He made a written note of the first three characters of the license plate. (*Id*.)

According to Mr. Hawk, the woman was slightly slumped over and he immediately became concerned that she was in danger. (*Id*.) He began to slow down; but as he approached the men, one of them reached into his inner coat as if he was going to pull out something, then quickly pulled out his hand and stuck his other hand into his outer coat pocket, while motioning for Mr. Hawk to drive through. (*Id*.) Mr. Hawk interpreted the man's gestures as suggesting that he had a gun in his pocket. (*Id*.) When Mr. Hawk subsequently received a description of Ms. Romain, he indicated that it fit the description of the woman he saw on the break-wall. (*Id*.) He was positive that one of the men he saw was Defendant Matouk. (*Id*.)

The Grosse Pointe Farms police never contacted Mr. Hawk after he turned in his written statement. (*Id*. ¶ 54.) However two years later, shortly after being interviewed by the FBI regarding what he had witnessed the night of January 12, 2010, Mr. Hawk was contacted by Defendant Anthony Chalut. (*Id*.) Defendant Chalut began asking Mr. Hawk questions about what he had discussed with the

13

FBI, and became very aggressive when Mr. Hawk confirmed that he could positively identify the two men he saw that evening if he saw them again or their pictures. (*Id*.) Defendant Chalut threatened to have Mr. Hawk charged with some variation of an obstructing an investigation charge. (*Id*.)

## II.    Standards Governing Defendants' Motions

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct at 1966).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Rule 12(e) of the Federal Rules of Civil Procedure provides that when a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response" a party may move for a more definite statement.

## III.   Analysis

### A.   Plaintiff's § 1983 Claims

In his motion, Defendant Matouk contends generally that Plaintiffs' § 1983 claim alleging denial of right of access to the courts should be dismissed because Plaintiffs fail to allege facts to establish the elements needed to establish the claim. He argues that Plaintiffs' § 1983 claim alleging a state created danger fails because

15

they fail to plead affirmative acts by Defendant Matouk as a state actor which created or increased the risk that Ms. Romain would be exposed to private acts of violence. Defendant Matouk asserts that he was never involved in the investigation of Ms. Romain's death and that the police department where he worked also was not involved in the investigation. He contends that Plaintiffs' allegations are "frivolous, speculative and clearly fail to state a plausible claim" and that they "resort to conclusory and speculative allegations." (ECF No. 77 at Pg ID 788.)

The Grosse Pointe Woods Defendants similarly argue that Plaintiffs do not make any specific factual allegations against each individual defendant to demonstrate their liability.

### 1.    Denial of Access to the Courts Claim (Count I)

As recently summarized by the Sixth Circuit Court of Appeals, there are two types of denial of access to the court claims:

> Denial of access to the courts claims may be "forward-looking" or "backward-looking." [Christopher v. Harbury, 536 U.S. 403, 415 12 (2002)]. In forward-looking claims, the plaintiff accuses the government of creating or maintaining some "frustrating condition," that stands between the plaintiff and "the courthouse door." *Id*. at 413, 122 S. Ct. 2179. The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate, *see Pena v. Mattox*, 84 F.3d 894, 902 (7th Cir. 1996), to sue on some underlying legal claim. *See Christopher*, 536 U.S. at 413, 122 S. Ct. 2179 (collecting cases). In backward-looking claims . . . the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the

16

> underlying claim. *See id.* at 413-14, 122 S. Ct. 2179. Backward-
> looking claims are much less established than forward-looking claims,
> *see Sousa v. Marquez*, 702 F.3d 124, 127–28 (2d Cir. 2012) (pointedly
> assuming arguendo, instead of holding, that backward-looking claims
> are cognizable at all), but this Court has recognized them and the
> Supreme Court has provided additional guidance as to the elements of
> a viable backward-looking claim.

*Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013).  The present case, like

*Flagg*, presents a back-ward looking claim.  In *Flagg*, the court of appeals

enumerated the elements of such a claim as: "(1) a non-frivolous underlying

claim . . .; (2) obstructive actions by state actors . . .; (3) "substantial[ ] prejudice"

to the underlying claim that cannot be remedied by the state court . . .; and (4) a

request for relief which the plaintiff would have sought on the underlying claim

and is now otherwise unattainable . . .."  *Id.* (internal citations omitted).

The plaintiff must establish these "elements against each defendant in

conformance with the requirements of § 1983."  *Id.*  As the *Flagg* court elaborated:

> Under § 1983, there is no respondeat superior or vicarious
> liability. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115,
> 122, 112 S. Ct. 1061, 117 L.Ed.2d 261 (1992). When suing an
> individual actor . . . for constitutional violations under § 1983, a
> plaintiff must demonstrate that the actor "directly participated" in the
> alleged misconduct, at least by encouraging, implicitly authorizing,
> approving or knowingly acquiescing in the misconduct, if not carrying
> it out himself. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.
> 1999). To prove acquiescence, it is not enough to show that the actor
> merely failed to act against misconduct of which he was aware. *See
> id.; Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).
>
> When suing a municipality . . . for constitutional violations
> under § 1983, a plaintiff must prove that the deprivation occurred

> pursuant to a municipal "policy or custom." *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994). A single decision can constitute a policy, if that decision is made by an official who "possesses final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986), which means that his decisions are "final and unreviewable and are not constrained by the official policies of superior officials." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (internal quotation marks omitted).

715 F.3d at 174-75.

Addressing Plaintiffs' denial of access claim in his motion to dismiss, Defendant Matouk simply states the four elements of the claim and then asserts that Plaintiffs' Amended Complaint "fails substantially to meet any of these elements." (ECF No. 77 at Pg ID 786.)  He does not elaborate further.  He cites neither Supreme Court nor Sixth Circuit precedent relevant to assessing what a plaintiff must allege to satisfy the four elements and how, specifically, the facts in Plaintiffs' Amended Complaint fall short.  The Grosse Pointe Woods Defendants do not address the elements of this claim, as they simply adopt Defendant Matouk's argument.  Both motions to dismiss focus, instead, on whether sufficient facts are pled to support the claim against a particular defendant.

Therefore, this Court will not devote a significant portion of this decision to explain its evaluation of whether Plaintiffs have pled sufficient facts to satisfy the elements of their denial of access claim.  Undoubtedly, Plaintiffs present sufficient facts in the Amended Complaint to establish a non-frivolous underlying claim (a

18

civil action against Ms. Romain's killer) and the obstructive actions *of all but two* Defendants (e.g., concealing and tampering with evidence indicating that Ms. Romain was killed and did not commit suicide and the identity of the killer).[4] While it also is without doubt that the obstructive actions alleged have caused substantial prejudice to the underlying claim, the Court believes that Plaintiffs' Amended Complaint does not specifically provide facts indicating that this prejudice cannot be remedied by the state court (or this Court, as the wrongful death action has been filed here).  *See Harbury*, 536 U.S. at 415 (providing that "the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought."); *Flagg v. City of Detroit*, 447 F. Supp. 2d 824, 834 (E.D. Mich. 2006) (allowing the plaintiff to amend his complaint where he failed to allege that he was "foreclosed from bringing a state-court wrongful death action against 'John Doe' defendants, which in turn would provide a vehicle for discovery concerning any alleged concealment of evidence or any promising leads that were abandoned in the local and state investigations [of his mother's death].").

---

[4] The state actor component of this second element will be discussed *infra* as it relates to Defendant Matouk.  As will also be discussed *infra*, Plaintiffs do not allege specific conduct (wrongful or otherwise) by Defendants Dennis Walker or Martin Mitchell in their Amended Complaint.

Plaintiffs also do not allege sufficient facts to indicate why the relief they would have sought on the underlying claim is now otherwise unattainable. *Flagg, supra*. Plaintiffs do not allege that they are now foreclosed from bringing the underlying claim; nor do they allege "that any pertinent statute of limitations has run, or that key evidence or witness testimony has been irretrievably lost." *Flagg*, 447 F. Supp. 2d at 834 (footnotes omitted). That they have in fact asserted a wrongful death claim here suggests that Defendants' actions have not rendered relief unattainable.[5]

As stated earlier, it is not enough that Plaintiffs plead facts to satisfy the four elements of their denial of access to the courts claim. They also must plead facts to satisfy these "elements against each defendant in conformance with the requirements of § 1983." *Flagg, supra*. However, Plaintiffs have described specific "obstructive actions" by Defendants Matouk and all of the Grosse Pointe Woods Defendants, except Defendants Dennis Walker and Martin Mitchell.

Plaintiffs fail to mention Defendants Walker or Mitchell anywhere but in the caption of their Amended Complaint and when identifying their positions and residency. (*See* ECF No. 3.) As such, Plaintiffs fail to state facts suggesting that

---

[5] The Grosse Pointe Woods Defendants do argue in their motion to dismiss that "Plaintiffs claims *may* be barred by the statute of limitations." (ECF No. 82 at Pg ID 969.) They focus, however, only on the limitations period applicable to Plaintiffs' § 1983 claims. Moreover, they do not assert their time-barred argument with much conviction. (*Id*.)

these defendants " 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out [themselves].' " *Flagg, supra*.  In comparison, Plaintiffs identify the specific acts of the remaining Grosse Pointe Woods Defendants which Plaintiffs claim constituted tampering with, altering, or withholding evidence suggesting that Ms. Romain was killed and/or did not commit suicide.  (*See, e.g., id*. ¶¶ 41, 48, 54, 57, 59-62.)  Plaintiffs allege that Defendant Matouk provided false information to support the police officers' suicide theory and that he conspired with the state actors to conceal Ms. Romain's murder.[6]  (*Id*. ¶¶ 34, 47.)  As such, for the reasons discussed in the paragraphs that follow, although Defendant Matouk was not assigned to investigate Ms. Romain's disappearance in his official capacity as a Harper Woods police officer, there are sufficient allegations in the Amended Complaint to find him liable under § 1983.[7]

---

[6] Although not set forth in Plaintiffs' Amended Complaint, Ms. Romain's family members state in affidavits submitted in support of Plaintiffs' response briefs that Defendant Matouk has a "personal relationship with many of the Grosse Pointe Farms and Woods police officers."  (ECF No. 80-4 ¶ 5; ECF No. 80-5 ¶ 5; 80-6 ¶ 5.)

[7] As alluded to earlier, to prove a § 1983 claim, the plaintiff must show that the defendant violated the plaintiff's federal rights while acting under color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (citation omitted). "Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 359 (Cont'd . . .)

21

*See Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004).

As the Sixth Circuit recognized in *American Postal Workers Union*, there are three tests for holding a private individual or entity liable under § 1983:

> the public function test, the state compulsion test, and the nexus test. *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992). The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Id.* at 1335. The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. *Id.* Finally, the nexus test requires a sufficiently close relationship between the state and the private actor so that the action taken may be attributed to the state. *Id.*

361 F.3d at 905.  The court went on to state, however, that the "[a]pplication of these tests to the conduct of a private entity . . . is relevant only in cases in which there are no allegations of cooperation or concerted action between state and private actors." *Id.* (citing cases).  Where such cooperation or concerted action is alleged, the private individual or entity qualifies as a state actor and may be found liable under § 1983.  *Cooper v. Parrish*, 203 F.3d 937, 952 n. 2 (6th Cir. 2000).

To prove a civil conspiracy, the plaintiff must show the following:

---

(6th Cir. 2001) (citing *West v. Atkins*, 487 U.S. 42, 49-50 (1988) ("The traditional definition of acting under color of state law requires that the defendant . . . exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.") (internal citation and quotation marks omitted).

> "[A]n agreement between two or more persons to injure another by
> unlawful action. Express agreement among all the conspirators is not
> necessary to find the existence of a civil conspiracy. Each conspirator
> need not have known all of the details of the illegal plan or all of the
> participants involved. All that must be shown is that there was a single
> plan, that the alleged coconspirator shared in the general
> conspiratorial objective, and that an overt act was committed in
> furtherance of the conspiracy that caused injury to the complainant."

*Id*. (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).  Here, all of

the elements of a civil conspiracy are sufficiently pled.  Plaintiffs assert that a

single plan existed: "The Defendants in this case conspired . . .."  (Am. Compl.

¶ 4.)  They allege that the conspirators shared in the general conspiratorial

objective: ". . . to cover up [Ms. Romain's] murder."  (*Id*.)  Finally, Plaintiffs

allege various overt acts committed in furtherance of the conspiracy (including acts

committed by Mr. Matouk) that deprived Plaintiffs of information relevant to

whether Ms. Romain was murdered and who murdered her.  (*See, e.g., id*. ¶¶ 49a-f,

50-54.)

    With respect to Plaintiffs' access to the courts claim, there remains only the

question of the proper remedy for the deficiencies in the Amended Complaint.  As

set forth above, Plaintiffs fail to state any actions by Defendants Dennis Walker or

Martin Mitchell to hold them personally liable for *any* violation.  Plaintiff's

allegations also are insufficient to show that Defendants' obstructive actions have

caused " 'substantial[ ] prejudice' to the underlying claim that cannot be remedied

by the state court" and that the relief they "would have sought on the underlying

claim is now otherwise unattainable." In light of the complexity of successfully pleading a right of access to the court claim-- particularly one such as this-- and the fact that Defendants' motions did not specifically identify how Plaintiffs failed to satisfy the claim's elements, the Court believes that Plaintiffs should have the opportunity to file an amended pleading that addresses these shortfalls, if they can.

### 2.    State Created Danger Claim (Count III)

In Count III of their Amended Complaint, Plaintiffs allege that Defendants' conduct created a risk that exposed Ms. Romain to danger and that Defendants knew their actions specifically endangered Ms. Romain. (Am. Compl. ¶¶ 84, 85.) More specifically, Plaintiffs allege that Defendants "ma[de] it known to Killer John Doe that they would immediately cover up [Ms. Romain's] murder and rule it a suicide." (*Id.* ¶ 86.) Plaintiffs list several facts which they believe supports this theory, such as: (a) an officer's arrival at the Romain home based on a LEIN check that in fact had not yet been run and which would not have connected the car allegedly found in the church parking lot to Ms. Romain; (b) the decision not to summons a K-9 unit, falsely claiming that dogs cannot track a scent in the cold; and (c) the officers' claim that footprints led from Ms. Romain's car to the lake, when in fact the pavement was dry and the only prints found in the snow could not have been created by Ms. Romain. (*Id.*)

Defendant Matouk contends that the facts alleged by Plaintiffs do not identify affirmative acts by him that would trigger his liability under the state-created danger doctrine.  The Grosse Pointe Woods Defendants, citing *DeShaney v. Winnegabo County Department of Social Services*, 489 U.S. 189 (1989), argue that Plaintiffs have not alleged and cannot show that their conduct with respect to the investigation of Ms. Romain's disappearance placed her "in any worse of a position had they not  acted at all."  (ECF No. 82 at Pg ID 962-63.)  They assert that Plaintiffs make only conclusory allegations to support this claim.

Ordinarily, a state official has no constitutional duty to protect an individual from violence inflicted by a private party.  *DeShaney*, 489 U.S. at 195 ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.").  There are two recognized exceptions to this rule: the "custody exception" and the "state created danger exception."  *See Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (citing *DeShaney*, 489 U.S. at 199-201).

To invoke the state-created danger exception, a plaintiff must present evidence of:

> (1) an affirmative act by the [defendant] that creates or increases a risk that the decedent would be exposed to "private acts of violence," (2) a special danger to the decedent such that the [defendant's] acts placed the decedent specifically at risk, as distinguished from a risk that affects the public at large, and (3) that the [defendant] knew or should

have known that [his or her] actions specifically endangered the
decedent.

*Jackson*, 429 F.3d at 591 (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055,

1066 (6th Cir. 1998)). Liability under the state-created danger exception is

predicated on the state's " 'affirmative acts which work to [the] plaintiffs'

detriments in terms of exposure to danger.' " *Sargi v. Kent City Bd. of Educ.*, 70

F.3d 907, 913 (6th Cir. 1995) (quoting *D.R. by L.R. v. Middle Bucks Area*

*Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992)). The "failure to act is

not an affirmative act under the state-created danger theory." *Cartwright v. City of*

*Marine City*, 336 F.3d 487, 493 (6th Cir. 2003).

Only if the Court restricted its review to the paragraphs set forth under their

state-created danger claim (*see* Am. Compl. ¶¶ 82-88) could the Court find that

Plaintiffs fail to allege specific affirmative acts by each defendant (aside again

from Defendants Walker and Mitchell). In the factual background section of their

pleading, Plaintiffs state specific acts taken by each defendant to conceal Ms.

Romain's murder and they expressly incorporate those allegations in Count III.

(Am. Compl. ¶ 82.) Within Count III, Plaintiffs also set forth the elements to show

a state-created danger.

Neither Defendant Matouk nor the Grosse Pointe Woods Defendants point

the Court to case law suggesting that Plaintiffs' theory of liability is not viable.

The Supreme Court's decision in *DeShaney* is distinguishable in that, here,

Plaintiffs claim that by agreeing to cover up Ms. Romain's murder before it occurred, Defendants enabled (and perhaps even encouraged) the individual(s) to go forward and kill her. At this stage of the proceedings, before the evidence is fully developed, this Court cannot conclude as a matter of law that Defendants' involvement and actions placed Ms. Romain "in no worse position than that in which [s]he would have been had it not acted at all." *DeShaney*, 489 U.S. at 201. In fact, the Court has found several cases suggesting that Plaintiffs have stated a viable state-created danger claim against Defendants. *See Dwares v. City of New York*, 985 F.2d 94 (2d Cir.1993); *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990).

In *Dwares*, the plaintiff filed a lawsuit against the city, police officers, and a private individual after the plaintiff was physically attacked by "skinheads" during his attendance at a demonstration that included the burning of an American flag. 985 F.2d at 96. The Second Circuit reversed the district court's dismissal of the plaintiff's due process claim because the plaintiff alleged facts indicating that the police did not simply fail to act but in some way assisted in creating or increasing the danger to the plaintiff. *Id*. at 99. Specifically, the plaintiff alleged that police officers were present when the plaintiff was assaulted by "skinheads" but did not intervene and that the city's police officers had conspired with "skinheads" to permit the latter to "beat up flag burners with relative impunity, assuring the

27

'skinheads' that unless they got totally out of control they would not be impeded or

arrested." *Id*. In determining that the plaintiff stated a viable claim, the court

observed:

> It requires no stretch to infer that such prior assurances would have
> increased the likelihood that the "skinheads" would assault
> demonstrators. Thus, in the present case, the complaint asserted that
> the defendant officers indeed had made the demonstrators more
> vulnerable to assaults. Further, it alleged that the officers had in effect
> aided and abetted the deprivation of [the plaintiff's] civil rights by
> allowing him to be subjected to the prolonged assault in their presence
> without interfering with the attack. Such a prearranged official
> sanction of privately inflicted injury would surely have violated the
> victim's rights under the Due Process Clause.

*Id*.

In *Freeman*, the Eighth Circuit similarly reversed the district court's

dismissal of the plaintiff's due process claim because the appellate court found

sufficient facts suggesting that the defendants did more than simply fail to protect

the decedents from private violence. 911 F.2d 52. In *Freeman*, a woman and her

daughter were killed by the woman's estranged husband. *Id*. at 53. The plaintiffs

alleged that the defendants repeatedly ignored the woman's pleas for help and

demands that they enforce a restraining order and stop her estranged husband

"from threatening, coming about, and intimidating her." *Id*. at 53-54. The circuit

court found the case distinguishable from *DeShaney* based on the plaintiffs'

assertion that the estranged husband was "a close bosom buddy of the [p]olice

[c]hief" and that they "would be able to show that on occasions some officers

28

attempted to stop the conduct of [the estranged husband] but they were directed not to by the police chief . . ..”  *Id*. at 54.  The court reasoned:

> It presents a claim that the violence the decedents were subjected to was not solely the result of private action, that it was also the result of an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community-- with such interference increasing the vulnerability of decedents to the actions of [the estranged husband] and possibly ratifying or condoning such violent actions on his part.

*Id*.

Here, Plaintiffs similarly allege that Defendants ratified or condoned the alleged killing of Ms. Romain by assuring the killer that evidence would be tampered with or concealed so as to suggest that she committed suicide.  The Court therefore is denying Defendants' request to dismiss Plaintiffs' state-created danger claim.

## B.    Plaintiffs' § 1985 Claim (Count II)

The Sixth Circuit applies the standard set forth in *Hooks* as the standard for proving a § 1985 conspiracy.  *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Hooks*, 771 F.2d at 943-44).  As discussed above, the Court finds that Plaintiffs plead facts with sufficient specificity to support a conspiracy claim against Defendants.  The Court therefore is denying Defendants' motions to dismiss this claim.

## C.     FOIA Claim (Count IV)

In this count, Plaintiffs allege that Michelle, through her attorneys, filed a lawsuit in Ingham County Circuit Court to obtain police reports and records from "Defendants".  (Am. Compl. ¶ 90.)  Plaintiffs further allege that despite the state court's order requiring Defendants to turn over some of the requested documents, Defendants still have not turned over the following: (a) the polygraph results of Ms. Romain's husband, David Romain; (b) fingerprint analysis of the car Ms. Romain was driving when she went missing; (c) the scarf found at the scene for examination; and (d) all of the police reports.

Defendant Matouk seeks dismissal of Plaintiffs' FOIA claim, arguing that "it is impossible for him to have denied Plaintiffs' FOIA request."  (ECF No. 77 at Pg ID 790.)  The Grosse Pointe Woods Defendants argue that under Michigan's Freedom of Information Act statute, requests for records are made to the public body, not individual public officials, and thus the individual police officers are not properly sued under the statute.  (ECF No. 82 at Pg ID 963.)  They argue that the claim must be dismissed against the municipality, as well, because the statute does not provide for federal court action; rather, it allows the aggrieved party to file suit in the state court, which Michelle already has done.  (*Id*.)  The Grosse Pointe Woods Defendants argue that if the state court ordered records to be produced and

the defendant(s) in that action did not comply, the proper recourse is to return to the state court to enforce its order.  (*Id.* at Pg ID 964.)

Plaintiffs argue in response to Defendant Matouk's motion that they have stated a plausible FOIA claim against him, asserting that "he worked to prevent release of relevant documents under FOIA."  (ECF No. 80-1 at Pg ID 886.)  Plaintiffs did not assert this allegation in their Amended Complaint.  Nevertheless, even if they did, dismissal of Plaintiffs' FOIA claim against all of the moving defendants is proper for the reasons set forth by the Grosse Pointe Woods Defendants.  Plaintiffs have not addressed those arguments in response to the Grosse Pointe Woods Defendants' motion.  (ECF No. 82 at Pg ID 963-64.)  Instead, Plaintiffs simply argue that they have stated a plausible claim under FOIA.

Plaintiffs acknowledge that Michelle obtained a state court order requiring "Defendants" to turn over the documents that are at issue in their FOIA claim.  The state court is the proper venue in which to seek enforcement of that order or sanctions for any refusal to obey.  To the extent Plaintiffs are pursuing this claim only to obtain evidence from Defendants, they can use the discovery process to do so.  The Court therefore is dismissing Count IV of Plaintiffs' Amended Complaint.[8]

---

[8] Although the Grosse Pointe Farms Defendants have not yet moved for dismissal of this claim, the Court is sua sponte dismissing this claim in its entirety as it (Cont'd . . .)

### D.     Spoliation of Evidence Claim (Count V)

Plaintiffs' spoliation of evidence claim is premised on Defendants' alleged failure to preserve certain evidence relevant to Ms. Romain's disappearance.  (Am. Compl. ¶¶ 94-96.)  Defendant Matouk and the Grosse Pointe Woods Defendants argue, correctly, that there is no independent cause of action for spoliation of evidence.  *Peak v. Kubota Tractor Corp.*, 559 F. App'x 517, 526 (6th Cir. 2014) (citing *Teel v. Meredith*, 774 N.W.2d 527, 529 (Mich. Ct. App. 2009)); *see also Dye v. City of Roseville*, No. 14-cv-11252, 2014 WL 7184460, at *8 (E.D. Mich. Dec. 16, 2014) ("[I]t is well-established that neither Michigan nor federal law permit independent causes of action arising out of an alleged spoliation of evidence.") (citing cases).  The Court therefore is dismissing this claim against all defendants.  *See supra* n. 8.

### E.     Due Process Claims Under Michigan's Constitution (Count VI)

In Count VI of their Amended Complaint, Plaintiffs allege that Defendants violated Article I, Section 17, of Michigan's Constitution, which reads:

> No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

---

would not survive against any defendant named in this action for the reasons set forth by the Grosse Pointe Woods Defendants.

Mich. Cons. art. I, § 17.  In their respective motions to dismiss, Defendant Matouk and the Grosse Pointe Woods Defendants cite cases establishing that the Michigan Constitution does not provide a basis for civil damages.  (ECF No. 77 at Pg ID 791; ECF No. 82 at Pg ID 965.)

Plaintiffs fail to address Defendants' argument or even this claim in their response briefs.  Thus the Court presumes that they are abandoning this claim. *See, e.g., Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (affirming the district court's conclusion that the plaintiff abandoned certain claims by failing to raise them in his brief opposing the government's motion to dismiss); *Meredith v. Allen Cnty. War Mem'l Hosp. Comm'n*, 397 F.2d 33, 34 n. 2 (6th Cir. 1968) ("Plaintiff also alleged in his complaint that jurisdiction existed under the antitrust laws, but this allegation was not advanced either in opposition [to] defendants' motion to dismiss or on appeal, and we therefore assume that the claim of antitrust violation has been abandoned."); *Mekani v. Homecomings Fin., LLC*, 752 F.Supp.2d 785, 797 (E.D.Mich. 2010) (stating that where a plaintiff fails to respond to an argument in a motion to dismiss, "the Court assumes he concedes this point and abandons the claim").  In any event, the claim is subject to dismissal for the reasons stated by the moving Defendants.

**F.      Municipal Liability Under 42 U.S.C. § 1983 (Count VII)**

In this count, Plaintiffs seek to hold Defendants City of Grosse Pointe Farms and City of Grosse Pointe Woods liable for the violations of Ms. Romain's civil rights.[9]  (Am. Compl. ¶¶ 103-106.)  Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be held liable for the deprivation of a plaintiff's constitutional rights only where the deprivation results from an official custom or policy of the municipality.  Pursuant to *Monell* and its progeny, municipal liability attaches only, "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, and there is an "affirmative link between the policy and the particular constitutional violation alleged," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823.  *See Bennett v. City of Eastpointe*, 410 F.3d 810, 818-19 (6th Cir. 2005).

In their attempt to establish municipal liability, Plaintiffs allege that the City of Grosse Pointe Farms and the City of Grosse Pointe Woods "implicitly or explicitly, adopted and implemented careless and reckless policies, customs and

---

[9] Plaintiffs' municipal liability claim also applies to the individual officers to the extent Plaintiffs seek to hold them liable in their official capacities, as any claim against them in their official capacities are actually claims against the municipality itself.  *See Petty v. Cnty. of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

34

practices that allowed the unconstitutional conduct" and "failed to enforce proper hiring standards and practices, failed to adequately train and supervise their employees, and failed to enforce the proper disciplinary procedures necessary to prevent the unconstitutional conduct . . .." (*Id.* ¶¶ 104, 105.) The Grosse Pointe Woods Defendants seek dismissal of Plaintiffs' municipal liability claim, arguing that "Plaintiffs' allegations are nothing more than threadbare recitals supported only by conclusory allegations and do not state a plausible claim of relief." (ECF No. 82 at Pg ID 968.) Specifically, they contend that Plaintiffs fail to identify a policy and show how the alleged injury was incurred because of such policy and fail to allege deliberate indifference to state a claim based on a failure to train, supervise, or enforce proper hiring standards. (*Id.*)

Responding to the Grosse Pointe Woods Defendants' arguments, Plaintiffs restate the law relevant to establishing municipal liability and general assertions for why the municipal defendants are liable: because they (1) "adopted and implemented careless and reckless policies"; (2) "failed to provide adequate training to the officers and the employees [who] were not properly supervised"; (3) "the investigation methods adopted were not proper"; and (4) no disciplinary procedures were initiated against officers involved in the concealment, destruction, and alteration of evidence." (ECF No. 85 at Pg ID 1000.) Plaintiffs fail to set forth any basis for this Court to conclude that these general allegations are

sufficient to survive dismissal under Rule 12(b)(6).  Sixth Circuit precedent,

however, establishes that Plaintiffs' allegations are adequate.  *See Petty v. Cnty. of*

*Franklin*, 478 F.3d 341 (6th Cir. 2007).

In *Petty*, the Sixth Circuit reviewed the district court's dismissal of the

plaintiff's municipal liability claim under Rule 12(b)(6), as well as its grant of

summary judgment to defendants on this and other claims.  *Id*. at 347-48.  With

respect to the plaintiff's municipal liability claim, the plaintiff alleged in his

complaint:

> 38.    Plaintiff hereby incorporates by reference thereto the preceding
> thirty-seven (37) paragraphs as if fully rewritten herein.
>
> 39.    Said acts by the individual Defendants County, Franklin County
> Sheriff's Department, Jim Karnes, John Doe # 1 and John Doe # 2,
> were proximately caused by certain customs and policies of
> Defendants County, Franklin County Sheriff's Department and
> Karnes, including but not limited to, a failure to adequately and
> reasonably train, supervise and discipline officers in such a way to
> properly protect the constitutional rights of citizens; and a specific set
> of policies established during the days of the incidents described
> above, which had the effect of permitting, encouraging, approving and
> ratifying violations of the constitutional rights of citizens, including
> Plaintif[f], as described above.
>
> 40. Defendants['] actions and conduct were the actual and
> proximate cause of injury, damages and losses sustained by Plaintiff.

*Id.*  The district court had held that these allegations "did not meet the 12(b)(6) bar,

because it 'identifies no official custom or policy of [the municipality] with regard

to his constitutional claim," and because it "fails to come forward with any facts to

36

demonstrate how, even if there were a custom or policy of the county, [the

plaintiff's] injuries are causally linked to the [municipality]'s alleged failure to

train and/or supervise." *Id*. at 347 (quoting *Petty v. Cnty. of Franklin*, No. 2:04-cv-

245, 2006 WL 571871, at *4 (S.D. Ohio Mar. 6, 2006)).  The Sixth Circuit

disagreed.

Although concluding that the plaintiff could not survive summary judgment

with respect to his municipal liability claim, the Sixth Circuit "was not convinced"

that the claim was properly dismissed pursuant to Rule 12(b)(6).  The court wrote:

> A "district court's dismissal of a civil rights complaint on a 12(b)(6)
> motion is scrutinized with special care." *Gazette [v. City of Pontiac*,
> 41 F.3d 1061, 1064 (6th Cir. 1994]. In this case, the district court
> itself recognized that it is not authorized to grant a motion to dismiss
> under 12(b)(6) unless it is "clear that no relief could be granted under
> any set of facts that could be proved consistent with the allegations."
> [*Petty*, 2006 WL 571871, at *3] (quoting *Hishon v. King & Spalding*,
> 467 U.S. 69, 73 (1984)). Given the allegations that [the plaintiff]
> makes in his complaint, it is not immediately clear what more [the
> plaintiff] could have alleged with respect to the policies that [the
> municipality] might or might not have. We wonder how [the plaintiff]
> would necessarily know, at the point of his complaint, and without the
> benefit of discovery, whether such a custom or policy might exist, and
> if it does exist, what its contours might be or how exactly it effected a
> violation of his constitutional rights.

*Petty*, 478 F.3d at 348.  While the Sixth Circuit's decision preceded the Supreme

Court's decisions in *Twombly* and *Iqbal*, some district courts in this Circuit have

continued to rely on *Petty* in denying defendants' motions to dismiss plaintiffs'

municipal liability claims.  *See, e.g., Stack v. Karnes*, 750 F. Supp. 2d 892, 899

(S.D. Ohio 2010); *Medley v. City of Detroit*, No. 07-15046, 2008 WL 4279360, at *7-8 (E.D. Mich. Sept. 6, 2008) (relying on *Petty* and indicating that "[a]ny suspicion about the type of policy or custom, if any, which resulted in the actions at issue here may be examined during discovery.  Its existence may be challenged during summary judgment."); *cf. Vidal v. Lexington Fayette Urban Cnty. Gov't*, No. 5:13-117-DCR, 2014 WL 4418113, at *3 (E.D. Ky. Sept. 8, 2014) (finding that district courts have rejected *Petty* following *Iqbal* and *Twombly*) (citing *Hutchison v. Metro. Gov't of Nashville & Davidson Cnty.*, 685 F.Supp.2d 747, 751 (M.D. Tenn. 2010) ("In the context of Section 1983 municipal liability, district courts in the Sixth Circuit have interpreted *Iqbal's* standards strictly."); *Scott v. Giant Eagle, Inc.*, No. 1:12-cv-3074, 2013 WL 1874853, at *4 (N.D. Ohio May 3, 2013).  This Court will continue to follow the Sixth Circuit's guidance in *Petty* until the appellate court instructs otherwise.

Thus *Petty* suggests that Plaintiffs should have the benefit of discovery before the claim should be dismissed.  Surely if Plaintiffs fail to uncover a policy, custom, or procedure causally linked to Ms. Romain's injuries, the claim will not survive summary judgment.  The Court therefore declines to grant the Grosse Pointe Woods Defendants' request to dismiss this claim.

38

**G.      Wrongful Death Claim (Count VIII)**

In this claim, incorporating Defendants' acts described earlier, Plaintiffs

allege that "[a]s a direct and proximate result of willful, reckless and/or malicious

acts of at least some of the Defendants, [Ms. Romain] was killed."  (Am. Compl.

¶¶ 107, 108.)  Defendant Matouk argues that Plaintiffs' pleading "is completely

devoid of any facts to plausibly state a claim for wrongful death" and "to show any

acts by Defendant Matouk with respect to Ms. Romain's death or his connection to

any of the alleged incidences described in the [Amended] Complaint."  (ECF No.

77 at 792.)  However, because Plaintiffs incorporate the facts set forth earlier in

their pleading and those facts could lead a juror to conclude that Defendant Matouk

killed Ms. Romain, the Court finds Defendant Matouk's argument to be frivolous.

On the other hand, the Grosse Pointe Woods Defendants' similar argument has

some merit as the allegations in Plaintiffs' Amended Complaint do not suggest that

any of those defendants actually murdered Ms. Romain.

Michigan's wrongful death statute provides in part:

Whenever the death of a person, injuries resulting in death, or death as
described in section 2922a *shall be caused by* wrongful act, neglect,
or fault of another, and the act, neglect, or fault is such as would, if
death had not ensued, have entitled the party injured to maintain an
action and recover damages, the person who or the corporation that
would have been liable, if death had not ensued, shall be liable to an
action for damages, notwithstanding the death of the person injured or

39

> death as described in section 2922a, and although the death was
> caused under circumstances that constitute a felony.

Mich. Comp. Laws § 600.2922(1) (emphasis added and footnote removed).  As the

italicized language indicates, liability arises only where the act, neglect, or fault of

the defendant "caused" the death or injuries resulting in death.  As with any tort

action, the conduct must be the cause in fact and legal or proximate cause of the

alleged injury.  *See Haliw v. Sterling Heights*, 627 N.W.2d 581, 588 (Mich. 2001).

"Cause in fact requires that the harmful result would not have come about but for

the defendant's negligent conduct."  *Id*. (citing *Skinner v. Square D Co.*, 516

N.W.2d 475, 479 (1994) (additional citation omitted).  " 'On the other hand, legal

cause or 'proximate cause' normally involves examining the foreseeability of

consequences, and whether a defendant should be held legally responsible for such

consequences.' "  *Id*. (quoting *Skinner*, 516 N.W.2d at 479).  The facts alleged in

Plaintiffs' Amended Complaint do not suggest that the Grosse Pointe Woods

Defendants' conduct was the cause of Ms. Romain's death.

Therefore, the Court is dismissing Plaintiffs' wrongful death claim against

these defendants.

## IV.   Conclusion

In summary, as an initial matter, Plaintiffs fail to set forth any conduct by

Defendants Dennis Walker or Martin Mitchell in their Amended Complaint to hold

40

these individuals liable for any of the violations alleged.  Thus the Court is

dismissing them as defendants to this action.

With respect to Count I of Plaintiffs' Amended Complaint, the Court finds

that Plaintiffs fail to adequately plead all of the elements of their denial of access to

the courts claim under 42 U.S.C. § 1983.  Specifically, Plaintiffs' Amended

Complaint lacks sufficient facts to set forth substantial prejudice to the underlying

claim that cannot be remedied by the state court and a request for relief that is not

otherwise attainable.  The Court concludes, however, that Plaintiffs should have

the opportunity to amend their pleading to remedy these defects, if they can.

The Court finds that Plaintiffs set forth facts to state a viable conspiracy

claim under 42 U.S.C. § 1985 (Count II), state created danger claim under § 1983

(Count III), and municipal liability claim (Count VII).  Plaintiffs fail to state a

claim on which relief may granted against *any* defendant with respect to their

FOIA claim (Count IV), spoliation of evidence claim (Count V), and claim

alleging due process violations under the Michigan Constitution (Count VI).

Finally, Plaintiffs do not set forth sufficient facts to state a wrongful death claim

(Count VIII) against the Grosse Pointe Woods Defendants.  They do, however,

state a viable claim against Defendant Matouk.

Accordingly,

**IT IS ORDERED**, that Defendant Timothy J. Matouk's motion to dismiss or, in the alternative, for a more definite statement (ECF No. 77) is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED**, that the motion to dismiss filed by the Grosse Pointe Woods Defendants (ECF No. 82) is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED**, that Defendants Dennis Walker and Martin Mitchell are **DISMISSED AS DEFENDANTS**;

**IT IS FURTHER ORDERED**, that Plaintiffs' claims alleging FOIA violations (Count IV), spoliation of evidence (Count V) and violations of due process under the Michigan Constitution (Count VI) are **DISMISSED WITH PREJUDICE** as against all defendants;

**IT IS FURTHER ORDERED**, that Plaintiffs' wrongful death claim (Count VIII) is **DISMISSED WITH PREJUDICE**, as to the following defendants, **ONLY**: City of Grosse Pointe Woods, Andrew Pazuchowski, John Kosanke, John Ross, Keith Waszak, and Anthony Chalut;

**IT IS FURTHER ORDERED**, that Plaintiffs shall file a second amended complaint within fourteen (14) days of this Opinion and Order which (1) corrects the deficiencies in their denial of access claim, if they can, and (2) reflects the

42

holdings in this decision.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 18, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, March 18, 2015, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager

43