UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF JOANN MATOUK ROMAIN
and MICHELLE MARIE ROMAIN, in her personal
representative capacity of the Estate,

          Plaintiff,

                                 Civil Case No. 14-cv-12289
v.                                    Honorable Linda V. Parker

THE CITY OF GROSSE POINTE FARMS,
DANIEL JENSEN, JACK PATTERSON,
ANDREW ROGERS, RICHARD A. ROSATI,
MICHAEL MCCARTHY, KEITH COLOMBO,
ANTONIO TRUPIANO, JOHN WALKO,
FRANK ZIELINSKI, RICKY GOOD,
THE CITY OF GROSSE POINTE WOODS,
ANDREW PAZUCHOWSKI, JOHN KOSANKE,
JOHN ROSS, KEITH WASZAK,
ANTHONY CHALUT, OFFICER JOHN DOE,
TIMOTHY J. MATOUK, JOHN DOE, and
KILLER JOHN DOE,

          Defendants.
_____/

## **OPINION AND ORDER**

## I.    **Introduction**

      Joann Matouk Romain ("Ms. Romain") disappeared on the evening of

January 12, 2010, after attending services at St. Paul's Church in Grosse Pointe

Farms, Michigan. Upon discovering her SUV abandoned in the church driveway,

Grosse Pointe Farms Public Safety Officers began an investigation. The officers

quickly suspected that Ms. Romain had walked down the church driveway, across Lake Shore Drive, and into Lake St. Clair. Within days, with Ms. Romain still not found, the Grosse Pointe Woods Public Safety Department took over the investigation. Fishermen discovered Ms. Romain's body in the Detroit River two months after she disappeared.

Michelle Marie Romain, Ms. Romain's daughter and the personal representative of her estate, believes her mother was murdered and that officers from both police departments conspired with her killer to cover up the fact that she was murdered and the killer's identity. Therefore, on June 14, 2014, Michelle, individually and as personal representative of Ms. Romain's estate ("Plaintiff"), filed this lawsuit against the public safety officers involved in the investigation, the unidentified suspected killer, and Ms. Romain's cousin, Timothy Matouk. In a Second Amended Complaint filed March 31, 2015, Plaintiff alleges the following claims against Defendants: (1) conspiracy to violate Ms. Romain's federal rights under 42 U.S.C. § 1985; (2) infringement of Ms. Romain's federal rights through a state-created danger in violation of 42 U.S.C. § 1983; (3) municipal liability under § 1983; and (4) wrongful death pursuant to § 1983.

After years of litigation and with discovery concluded, the case is now before the Court to determine if Plaintiff can present facts to support her claims. While the circumstances surrounding Ms. Romain's disappearance and death

remain a mystery, and in fact are somewhat suspicious, the Court concludes that Plaintiff fails to create a genuine issue of material fact to hold Defendants liable under the theories pled.

## II.    **Procedural Background**

Three and a half years ago, Plaintiff filed this lawsuit claiming that Defendants murdered and/or conspired to cover up the murder of Ms. Romain. Defendants are Timothy J. Matouk, John Doe, "Killer John Doe," "Officer John Doe," and two groups of defendants, which the Court has referred to during the litigation as the "Grosse Pointe Farms Defendants" and the "Grosse Pointe Woods Defendants."[1] The Grosse Pointe Farms Defendants remaining in this lawsuit are the City of Grosse Pointe Farms, its Chief of Police and Director of Public Safety Daniel Jensen, Lieutenants Jack Patterson and Andrew Rogers, and Public Safety Officers Antonio Trupiano, Ricky Good, John Walko, Frank Zielinski, Richard A. Rosati, Michael McCarthy, and Keith Colombo. The Grosse Pointe Woods Defendants remaining in this lawsuit are the City of Grosse Pointe Woods, its

---

[1] Plaintiff has identified Grosse Pointe Woods Public Safety Officer Darrell Fisher as the Officer Doe named in her pleadings. On September 16, 2016, Plaintiff filed a motion for leave to file an amended complaint to *inter alia* add Fisher as a defendant, which this Court denied in an opinion and order issued April 21, 2017. (ECF No. 313.) The Court therefore is *sua sponte* dismissing Officer John Doe as a defendant. The Court also is dismissing Defendants "John Doe" and "Killer John Doe" as Plaintiff has yet to identify them in these proceedings.

Sargent and Director of Public Safety Andrew Pazuchowski, and Public Safety

Officers Keith Waszak and Anthony Chalut.

On March 31, 2015, Plaintiff filed a Second Amended Complaint asserting

the following claims:

> Count II[2]- Violation of civil rights under 42 U.S.C.
> § 1985 (conspiracy) against all Defendants.
>
> Count III-Violation of civil rights under 42 U.S.C.
> § 1983 (state-created danger) against all Defendants.
>
> Count IV- Violation of civil rights under 42 U.S.C.
> § 1983 municipal liability (failure to implement
> appropriate policies, customs and practices) against all
> Defendants.
>
> Count V-Violation of civil rights under 42 U.S.C. § 1983
> (wrongful death) against the Grosse Pointe Farms
> Defendants, Defendant Timothy J. Matouk, John Doe
> and Killer John Doe.[3]

(ECF No. 93.)  On September 16, 2016, Plaintiff sought leave to file a Third

Amended Complaint, which would *inter alia* add a "class-of-one" equal protection

claim and a denial of access to the courts claim.  (ECF No. 228.)  In an opinion and

order entered April 21, 2017, the Court denied Plaintiff's motion.  (ECF No. 313.)

---

[2] The Second Amended Complaint does not have a Count I.

[3] The Court previously dismissed Plaintiff's wrongful death claim against the
Grosse Pointe Woods Defendants because the facts alleged in the complaint did
not suggest that their conduct caused Ms. Romain's death.  (ECF No. 91 at Pg ID
1096.)

Pursuant to a Third Amended Scheduling Order entered September 1, 2016, discovery in this matter closed on November 15, 2016, and the deadline for filing dispositive motions was February 3, 2017. (ECF No. 206.) The Grosse Pointe Woods Defendants filed a motion for summary judgment on February 2, 2017. (ECF No. 274.) Defendant Timothy Matouk filed a motion for summary judgment and an amended motion for summary judgment on February 2 and 3, 2017, respectively. (ECF Nos. 276, 278.) On February 3, 2017, the Grosse Pointe Farms Defendants filed their motion for summary judgment. (ECF No. 280.) The Grosse Pointe Farms Defendants filed supplemental briefs in support of their motions on March 2, 2017 (ECF Nos. 295, 296) and March 24, 2017. (ECF No. 300.)[4]

After receiving extensions of the deadline to respond to Defendants' summary judgment motions, Plaintiff filed a single response brief on March 13, 2017. (ECF No. 298.) Plaintiff filed a supplemental brief correcting some factual errors in her response on March 15, 2017. (ECF No. 299.) Defendants filed reply briefs on April 13 and 17, 2017. (ECF Nos. 302, 306, 307.)

In their reply brief filed April 13, 2017, the Grosse Pointe Farms Defendants pointed out that Plaintiff failed to attach numerous documents cited in her response brief, which were not otherwise part of the evidentiary record. (ECF No. 302 at Pg ID 7087-88 and n.2.) Plaintiff filed a supplemental brief attaching those

---

[4] This third supplemental brief simply contains an affidavit, now notarized, that the Grosse Pointe Farms Defendants filed earlier.

documents on April 14, 2017. (ECF No. 304.) Defendants have objected to Plaintiff's filing because she did not seek leave of Court to do so and the documents were untimely filed. The Court sees no merit to Defendants' objections, as Plaintiff simply was correcting a technical error and had timely put Defendants on notice of the existence and contents of those documents.

The Court held a motion hearing with respect to Defendants' summary judgment motions on February 20, 2018.

## III. <u>Summary Judgment Standard</u>

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To

demonstrate a genuine issue, the nonmoving party must present sufficient evidence

upon which a jury could reasonably find for that party; a "scintilla of evidence" is

insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the

non-movant's evidence and draw "all justifiable inferences" in the non-movant's

favor. *See Liberty Lobby*, 477 U.S. at 255.

    "A party asserting that a fact cannot be or is genuinely disputed" must

designate specifically the materials in the record supporting the assertion,

"including depositions, documents, electronically stored information, affidavits or

declarations, stipulations, admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1). "[A] party opposing a motion for summary judgment may

not rest upon the mere allegations or denials of his pleadings, but his response, by

affidavits or as otherwise provided in [Rule 56(c)], must set forth specific facts

showing that there is a genuine issue for trial." *Hooks v. Hooks*, 771 F.2d 935, 945

(6th Cir. 1985) (quotation marks and citation omitted). As the Supreme Court

advised in *Celotex*: "One of the principle purposes of the summary judgment rule

is to isolate and dispose of factually unsupportable claims or defenses …." 477

U.S. at 323-24.

Finally, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## IV.    Factual Background

On January 12, 2010, at around 8:58 p.m., Grosse Pointe Farms ("GPF") Lieutenant Andrew Rogers was on routine patrol when he noticed a silver Lexus SUV parked at the end of a one-way exit driveway from St. Paul's Church. (ECF No. 280-3 at Pg ID 5322.) The church is located on Lake Shore Drive in Grosse Pointe Farms, across from Lake St. Clair.

Lieutenant Rogers ran the vehicle's license plate from his patrol car through the Law Enforcement Information Network ("LIEN") system and learned that the car was registered to Kathy Matouk and Michelle Romain, Ms. Romain's daughters. (*Id*. at Pg ID 5322-24.) Rogers also learned that the license plate had expired several days earlier. (*Id.*) Because the vehicle was on private property, Lieutenant Rogers did not believe there was a reason to investigate further or issue a ticket. (*Id*.)

About an hour later the same evening, GPF Public Safety Officer ("PSO") Keith Colombo, also on routine patrol, came upon the Lexus. (ECF No. 280-5 at Pg ID 5347-48.) Colombo was concerned because the Lexus was the only vehicle in the driveway, he saw no one around, and it was late on a cold January weeknight. (*Id*. at Pg ID 5348.) He approached the Lexus and illuminated the interior with a flashlight to confirm that there was no one inside the vehicle, which there was not. (*Id*. at Pg ID 5349.) PSO Colombo then returned to his patrol car and ran SUV's license plate through LEIN and discovered it was registered to Kathy Matouk and Michelle Romain, with an address of 693 Morningside Lane, Grosse Pointe Woods. (*Id*.; ECF No. 280-24 at Pg ID 5649; ECF No. 280-25 at Pg ID 5651)

PSO Colombo then got out of his patrol car to check the area. (ECF No. 280-5 at Pg ID 5348.) Not seeing anyone, PSO Colombo thought the driver and/or

occupants of the Lexus might be down by the water's edge because, in his

experience, people "very frequently" park in the church parking lot and streets

adjacent to Lake Shore Drive and go down to the lake. (*Id*.) Aided by the

headlights and spotlight from his patrol car facing south on the driveway toward

Lake Shore Drive, the ambient light from the snow-covered ground, and his

flashlight, PSO Colombo noticed footprints in the snow on the south-side of Lake

Shore Drive, leading to an embankment. (*Id*. at Pg ID 5350-51.) The footprints

began about seventy-five feet from the Lexus. (*Id*.)

PSO Colombo then walked across Lake Shore Drive to the curb closest to

the lake, where he saw footsteps in the snow leading down toward a second

embankment at the water's edge. (*Id*. at Pg ID 5351.) An impression in the snow

on the first breakwall suggested that someone had sat down on the breakwall and

pushed off to get down to the second breakwall. (ECF No. 280-2 at Pg ID 5260.)

Additional prints suggested that someone also had sat down on the second

breakwall. (*Id*.) Colombo looked for footprints in the snow leading back from the

water and saw nothing but fresh snow. (*Id*.)

Based on the footprints and the fact that the lake was open water with no ice

leading directly from the embankment edge or seawall edge into the lake, PSO

Colombo thought that the individual from the car might be in the water. (*Id*.)

Over the radio, he reported a suspicious car parked in the driveway of St. Paul's

Church and requested assistance from his supervisor, Lieutenant Rogers. (ECF No. 280-3 at Pg ID 5323.) Colombo's report was recorded by the GPF dispatcher, who ran a LEIN on the Lexus' license plate at 10:01 p.m., which confirmed that the vehicle was registered to Kathy Matouk and Michelle Romain. (ECF No. 280-7 at Pg ID 5400-01; ECF No. 280-24.)

Lieutenant Rogers and GPF PSO Antonio Trupiano arrived on the scene in response to PSO Colombo's report. Colombo showed Rogers and Trupiano what he found and they agreed that someone might be in the water. (ECF No. 280-3 at Pg ID 5330; ECF No. 280-7 at Pg ID 5391.) Lieutenant Rogers activated the GPF dive team, which consisted of Sergeant Holly Krizmanich and PSOs Colombo, Wesley Kipke, John Walko, and Geoffrey McQueen.[5] (ECF No. 280-2 at Pg ID 5261. Lieutenant Rogers also contacted the United States Coast Guard for assistance in the search and rescue. (*Id*.) Rogers testified that he contacted the Coast Guard shortly after 10:00 p.m. (ECF No. 280-3 at Pg ID 5333.)

The Coast Guard's records apparently contain a discrepancy as to what time it was contacted to assist in the search and rescue. Several pages of the Coast Guard's Search and Rescue ("SAR") file reflect that it was contacted about a person in the water off Lake Shore by GPF Lieutenant Rogers via land line at 10:33 p.m. (ECF No. 296-2 at Pg ID 5864-66, 5873, 5876, 5888.) The Coast

---

[5] Plaintiff initially named Krizmanich, McQueen, and Kipke as defendants in this lawsuit, but they have since been dismissed.

Guard's Situation Report ("SITREP"), however, apparently reflects that assistance

was requested at 9:30 p.m., an airboat was launched at 9:38 p.m., and the airboat

was on scene at 9:51 p.m.[6]  (ECF No. 296-2 at Pg ID 5861.)  In an affidavit

submitted in support of the GPF Defendants' motion for summary judgment, Bruce

W. Czako, the Coast Guard Officer who received Lieutenant Rogers' call, states

that these earlier entries are incorrect based on his personal recollection of the

events in question and the other entries in the Search and Rescue file.  (ECF No.

296-2 at Pg ID 5855.)  Czako indicates that the incorrect times are times entered

manually by a station member.  (*Id*. at Pg ID 5856.)

United States Coast Guard Operations Specialist First Class Petty Officer

Stephen E. Veda confirms Czako's statements in a separate affidavit submitted in

support of the GPF Defendants' motion for summary judgment.  (ECF No. 295-2.)

Veda was serving as a Search and Rescue Controller in the Sector Detroit

Command Center on January 12, 2010.  (*Id*. at Pg ID 5754.)    Veda states that he

was notified by Coast Guard Station St. Clair Shores at 10:34 p.m. of a person in

the water.  (*Id*. at 5755.)

---

[6] Plaintiff does not identify specifically where in the SITREP these times are
reflected.  In fact, certain portions of the report provide times in Zulu Time or
Romeo Time, not Eastern Standard Time.  In a letter to Plaintiff's counsel,
however, counsel for the Coast Guard states that entries in the "Action Taken"
sections of the SITREP reflect these earlier times.  (ECF No. 296-2 at Pg ID 5861.)

As further proof that the Coast Guard was notified prior to 10:30 p.m., Plaintiff points to Veda's statement in his affidavit that the Coast Guard received a *report of a person missing* and possibly in the water at 10:34 p.m.[7] However, Grosse Pointe Woods ("GPW") Public Safety Officer Darryl Fisher, the officer who Defendants claim went to 693 Morningside on the evening of January 12, 2010, testified that he did not report Ms. Romain as missing until 10:42 p.m. (ECF No. 280-9 at Pg ID 5413.) In other words, no person was reported missing until that time.

According to PSO Fisher, he was dispatched to 693 Morningside that evening to inquire about the Lexus.[8] (*Id*. at Pg ID 5410.) Using his cell phone, PSO Fisher called the dispatcher to find out more information. (*Id*.) Based on cell phone records, PSO Fisher identified this call to dispatch as occurring at 10:25 p.m. (*Id*. at Pg ID 5411.) According to Fisher, Michelle Romain answered the door at 693 Morningside when he arrived, and he then explained that he was there to inquire about the Lexus. (*Id*. at Pg ID 5412.) Michelle told PSO Fisher that her mother had the car. (*Id*.) Michelle invited PSO Fisher inside the residence. (*Id.*)

---

[7] Plaintiff also finds it suspicious that the Coast Guard report includes the statement that the person had been missing since 5:00 p.m. and that footprints led from the car to the water's edge. (*See* ECF No. 298 at Pg ID 5991.) GPF Lieutenant Rogers testified that he was the only person to contact the Coast Guard, but he was not the source of this information. (ECF No. 280-3 at Pg ID 5327.)
[8] Defendants explain that a Grosse Pointe Woods officer would have been asked to visit the home because it was within their jurisdiction.

Fisher testified that there was another female inside the home and that other family members arrived while he was there. (*Id*. at 5413.)

According to PSO Fisher, he then asked Michelle to try and make some telephone calls to see if she could locate her mother. (*Id.* at Pg ID 5413.) He witnessed Michelle making several calls. (*Id.*) At 10:42 p.m., Fisher made a call from his cell phone, which he testified was to dispatch to report the information he had gleaned. (*Id*. at Pg ID 5413.) Fisher called the dispatcher again at 10:49 p.m., asking the dispatcher to contact Grosse Pointe Farms to indicate that Ms. Romain's family members were coming to St. Paul's Church. (*Id*. at Pg ID 5414.) According to Fisher, he left the residence at the same time as these family members. (*Id*.)

Michelle Romain asserts that the GPW officer who came to her house the evening of January 12, 2010, was not PSO Fisher. (ECF No. 298-13 at Pg ID 6740.) According to Michelle, the officer was approximately 6 ft. 1 in. in height, which is much taller than PSO Fisher, and had very dark hair and a slender build. (*Id*.) Michelle describes PSO Fisher as having light brown hair and a stocky build. (*Id*.) According to the Grosse Pointe Woods Defendants, Plaintiff was provided in discovery a roster of all GPW Department of Public Safety employees and their photographs, but Michelle has not identified any of those individuals as the person

who came to 693 Morningside the evening of January 12, 2010. (ECF No. 274 at Pg ID 4415 n.4.)

Michelle also insists that the officer who came to the house arrived at 9:25 p.m. and specifically inquired about the whereabouts of her mother, stating that her mother's car was found parked in the St. Paul's Church parking lot. (*Id*.) As Michelle points out in her affidavit, the Lexus was not licensed in her mother's name. (*Id*.) Thus, Michelle immediately became suspicious.

Michelle also indicates in contradiction to PSO Fisher's testimony that when she left the house to go to St. Paul's Church, the officer who came to the house stayed at the residence with other family members who were making calls to family and friends to find Ms. Romain. (*Id*. at Pg ID 6741.) Michelle provides that she left the house with her sister Kellie and Uncle John Matouk at 9:45 p.m., and arrived at St. Paul's Church between 9:55 and 10:00 p.m. (*Id*.) Michelle further provides that when they arrived, she saw a helicopter with lights shining into the lake across Lake Shore Drive. (*Id.*) There was caution tape around the Lexus and an officer utilizing a tool to open the car door. (*Id*.) Michelle attests that she saw the officer gain entrance to the vehicle and remove her mother's black purse and search its contents. (*Id*.) The contents of the purse did not include a cellphone or keys. (ECF No. 280-2 at Pg ID 5260.)

The purse retrieved from the Lexus was torn.  The tear was not on the strap and, according to several officers, did not appear to come from a physical struggle or suggest evidence of foul play.[9]  (ECF No. 280-20 at Pg ID 5586; ECF No. 280-14 at Pg ID 5503; ECF No. 280-19 at Pg ID 5580.)  According to Defendant Daniel Jensen, GPF Chief of Police and Director of Public Safety, the tear was on the flap area of the purse.  (ECF No. 280-20 at Pg ID 5586.)  The tear is pointed out in the photographs of the purse taken after it was found.  (ECF No. 280-6 at Pg ID 5370-74.)  These photographs reflect a portion of the top ruffle of the purse, which has approximately nine layers of horizontal ruffles, detached at the seam. (*Id.*)

In the meantime, by approximately 11:00 p.m., GPF Detective Michael McCarthy had arrived on the scene.  (ECF No. 280-2 at Pg ID 5270; ECF No. 280-14 at Pg ID 5505.)  The GPF dive team and Coast Guard already were in the water and searching for a body when Detective McCarthy arrived.  (ECF No. 280-2 at Pg ID 5270.)  Detective McCarthy took pictures of the footprints in the snow, noting that the pavement from the vehicle to the east edge of Lake Shore Drive was dry

---

[9] Plaintiff hypothesizes that the purse was torn during a struggle.  Michelle provides that Ms. Romain carries her purse routinely on her left shoulder.  (ECF No. 298-13 at PG ID 6742.)  It is noted in the summary of the autopsy report from the University of Michigan that Ms. Romain had a contusion on the left upper arm. (ECF No. 280-23 at Pg ID 5645.)

and no prints were observed.[10]  (ECF No. 280-2 at Pg ID 5270; ECF No. 280-14 at

Pg ID 5507; *see also* ECF No. 280-6 at Pg ID 5361-64.)  While the GPF officers

put some tape up to rope off the area where the prints were found, Lieutenant

Rogers testified that members of the Coast Guard walked through the area after

they arrived and the prints were not preserved by the time they were photographed.

(ECF No. 280-3 at Pg ID 5327.)

Nevertheless, McCarthy wrote in the GPF case file and testified at his

deposition that he observed footprints pointing in the direction of the lake, in the

grass sloping down toward a cement edge.  (ECF No. 280-2 at Pg ID 5270; ECF

No. 280-14 at Pg ID 5506)  He noted that at the cement edge, it appeared someone

may have sat down and that the prints then continued toward the lake to a second

(lower) cement edge.  (*Id.*)  He saw no prints after this point.  (*Id.*)  McCarthy

detected no sign of a struggle from the footprints.  (ECF No. 280-2 at Pg ID 5270.)

The GPF dive team and Coast Guard searched the water near the point of

suspected entry through the late evening and early morning hours of January 12

and 13, 2010.  The search continued until approximately 1:40 p.m. on January 13,

---

[10] In the GPF Department of Public Safety's report, PSO Trupiano reported:
"Tracks led from the vehicle to the waters [sic] edge."  (ECF No. Pg ID 280-2 at
Pg ID 5260.)  At his deposition, Trupiano acknowledged making the entry and that
there in fact were no visible footprints on the dry pavement the night of January
12, 2010.  (ECF No. 280-7 at Pg ID 5386.)  He explained his entry in the police
report was intended to convey that the tracks in the snow were in a straight line
from the driver's side of the vehicle down the embankment to the water's edge.
(*Id*. at Pg ID 5386-87.)

with no body being found.  GPF Sargent Jack Patterson, who is and was the officer in charge of GPF's fire division, brought the division's ladder truck to the scene the morning of January 13, in the event it was needed.  (ECF No. 280-15 at Pg ID 5519.)  Patterson described that there is a basket at the end of the truck's ladder that he believe would be used to pull a body out of the water, if one was found. (*Id.*)

At some point during the evening of January 12, 2010, Lieutenant Rogers found a black scarf in the median of Lake Shore Drive.  (ECF No. 280-2 at Pg ID 5260; ECF No. 280-3 at Pg ID 5337.)  Lieutenant Rogers showed the scarf to Michelle Romain when she arrived on the scene and she indicated that the scarf did not belong to her mother.  (ECF No. 280-3 at Pg ID 5337.)  The scarf was placed in an evidence locker at the GPF Department of Public Safety, but eventually donated to Goodwill.  (*Id.* at Pg ID 5333; ECF No. 280-2 at Pg ID 5612.)

The Lexus was towed to the GPF Department of Public Safety and, in the morning of January 13, 2010, McCarthy asked Defendant Ricky Good, a GPF PSO assigned to the detective division, to "be a secondary pair of eyes" and go through the vehicle.  (ECF No. 280-17 at Pg ID 5541.)  According to PSO Good, McCarthy said something along the lines of looking through the vehicle to see if there was anything suspicious or unusual about the contents.  (*Id.*)  Good received the key for

the Lexus from Defendant Frank Zielinski, another GPF PSO. (ECF No. 280-2 at Pg ID 5268.)

PSO Zielinski testified that during the morning of January 13, 2010, someone at the department instructed him to go and retrieve a set of keys for the Lexus. (ECF No. 280-18 at Pg ID 5551-52.) Good testified that the instructions did not come from him. (ECF No. 280-17 at Pg ID 5542.) At his deposition on October 9, 2015, Zielinksi could not recall who gave him the instructions or the address where he was sent. (ECF No. 280-18 at Pg ID 551-52.) He also could not describe the person who gave him the key when he arrived at the address. (*Id*.) Until shown PSO Good's report, Zielinski did not remember who he gave the key to when he returned to the police station. (*Id*. at Pg ID 5553.) According to Michelle Romain, four to six weeks before her mother's disappearance, her mother told her that a spare set of keys containing the Lexus spare key and house key, had gone missing. (ECF No. 298-13 at Pg ID 6741.)

During the first night of the search operation, GPF PSO Trupiano spoke with Ms. Romain's brother, John Matouk, who stated that Ms. Romain was upset and stressed over a lawsuit that started trial on January 12, 2010. (ECF No. 280-2.) John Matouk had come to St. Paul's Church with Michelle Romain after they were informed that the Lexus had been discovered there.

During the morning of January 13, 2010, GPF Detective McCarthy received a telephone call from Michelle Ault. (ECF No. 280-2 at Pg ID 5271.) Ault reported that when leaving the Grosse Pointe Academy at around 7:50 the night before, she saw a light colored crossover vehicle, possibly a Mercedes, parked on the church side of the academy grounds. (*Id*.) The academy is adjacent to St. Paul's Church. (ECF No. 304-3 at Pg ID 7224.) Ms. Ault did not observe or notice if the vehicle was occupied. (ECF No. 280-2 at Pg ID 5271.) McCarthy wrote in his notes that Ault said she did not believe anything appeared suspicious at the time, but then she saw the news reports that morning regarding Ms. Romain's disappearance. (*Id*.)

In an affidavit submitted by Plaintiff in this case, Ms. Ault also states that when she left the academy the evening of January 12, 2010, she also noticed a man running on the lakeside of Lake Shore Drive. (ECF No. 340-3 at Pg ID 7224.) The man was not wearing a coat, or was wearing a very light-weight coat, and he had a scarf around his neck. (*Id*.) Ms. Ault found it strange that anyone would be out running without being properly dressed for the cold weather. (*Id*.) She suggests in her affidavit that she also reported seeing the man when she spoke with the GPF officer on January 13, 2010. (*Id*.) At his deposition, Detective McCarthy only recalled Ms. Ault providing the information that he included in his report. (ECF No. 280-14 at Pg ID 5497.)

A little later on the morning of January 13, 2010, Detective McCarthy took a call from Nancy Barich, a paralegal with the law firm representing Ms. Romain in the proceedings involving her separation from her husband, David Romain. (ECF No. 280-2 at Pg ID 5271.) After seeing the news reports regarding Ms. Romain's disappearance, Ms. Barich decided to call the police. (*Id.*) According to Detective McCarthy's report, Ms. Barich indicated that Ms. Romain had been at the law firm's offices early the preceding week and appeared "distraught" and "paranoid." (*Id.*) According to Ms. Barich, Ms. Romain complained that David Romain was "controlling." (*Id.*) Ms. Barich found Ms. Romain's behavior not normal and unusual. (*Id.*)

Detective McCarthy returned to the scene at 10:30 a.m. on January 13 to meet with GPF Lieutenant Patterson. (*Id.*) Patterson told McCarthy that a relative, John Matouk, wanted to speak with him. (*Id.*) Patterson found John Matouk sitting in his vehicle in the driveway of St. Paul's Church, monitoring the search for his sister, and McCarthy introduced himself. (*Id.*) According to McCarthy, Matouk indicated that he needed to talk to him, but asked that it be at a later time. (*Id.*) McCarthy advised Matouk to contact him when he was available. (*Id.*)

Later in the day, Detective McCarthy returned a message from Jeanne Wyatt, who worked at the same law firm as Ms. Barich. (*Id.* at Pg ID 5272.) Ms. Wyatt told McCarthy that she saw Ms. Romain at the firm's offices within the last

few weeks and Ms. Romain "feared trouble from her husband." (*Id*.) According to Ms. Wyatt, Ms. Romain also believed someone was tampering with her mail, but Ms. Romain did not have anything specific. (*Id*.) Ms. Wyatt told Detective McCarthy that she did not think Ms. Romain was depressed and/or despondent. (*Id*.)

On January 13, 2010, Chief Jensen advised Ms. Romain's family to make a missing person report in Grosse Pointe Woods where she lived. (*Id*.) According to Grosse Pointe Woods Sargent and Director of Public Safety Andrew Pazuchowski, if there was no direct evidence that Ms. Romain entered the water in Grosse Pointe Farms, the "right thing to do" would be to handle the case where she lived, Grosse Pointe Woods. (ECF No. 274-7 at Pg ID 4771.) GPF Detective McCarthy faxed his department's report to the GPW Department of Public Safety. (ECF No. 280-2 at Pg ID 5272.)

The following morning, January 14, 2010, McCarthy received voicemail messages concerning Ms. Romain from Brian Bartlett, Elizabeth Fisher, and Martyna Nowak. (*Id*.) Before following up, McCarthy and Defendant Richard Rosati, a GPF detective and commander of its detective bureau, met with Michelle Romain in the GPF detective bureau office. (*Id.*) According to Detective McCarthy's report, Michelle told the officers that her mother was increasingly paranoid in the last few months. (*Id*.) Ms. Romain thought her cell phone was

being tapped and that people were entering her home and so she had the locks changed. (*Id.*) McCarthy wrote that Michelle did not believe any of her mother's concerns were substantiated or could be confirmed by anyone. (*Id.*)

Michelle nevertheless told McCarthy and Rosati that she did not think her mother's disappearance was voluntary. (*Id.*) Michelle indicated that her mother feared trouble from Husband David Romain and Cousin Tim Matouk. (*Id.*) Michelle did not have any specific reasons to believe they would harm her mother, but she thought her father might be capable of having someone else harm her. (*Id.*)

Michelle also told Detectives McCarthy and Rosati that Ms. Romain feared Tim Matouk because he is a police officer and she thought he was attempting to obtain information on Ms. Romain's brother, John Matouk, who Michelle said has had both criminal and civil issues. (*Id.*) Michelle indicated that she did not want to talk about her uncle, John Matouk, and that it would be best if they talked to him. (*Id.*) Michelle also believed that her mother's disappearance could be related to John Matouk, who she said may have targeted her mother for unknown actions. (*Id.*)

Michelle relayed that she had been with her mother in court on a civil matter on the day of her disappearance. (*Id.*) Michelle indicated that her brother (Michael), sister (Kellie), and father also were present. (*Id.*) The Romains were the plaintiffs in a lawsuit involving black mold in their home. (*See* ECF No. 274-5

at Pg ID 4601.)  Michelle last saw her mother when they left the courthouse—Ms.

Romain with Michael and Michelle with her father.  (ECF No. 280-2 at Pg ID

5272.)  Michelle indicated that she went to dinner with her father at a restaurant in

Grosse Pointe Woods and that they separated after dinner at approximately 9:00

p.m.  (*Id*.)  Michelle thought her mother dropped Michael at home, put gas in the

Lexus (reported as being documented by a surveillance tape at the gas station) and

then went to St. Paul's church.  (*Id*.)  Michelle reported that she was told by Cheryl

Sollar that she saw Ms. Romain's car alarm going off while parked in the church

driveway.  (*Id*. at Pg ID 5273.)

    After meeting with Michelle, Detectives McCarthy and Rosati met with

Grosse Pointe Woods Lieutenant Ross and Sergeant Pazuchowski regarding the

status of the investigation.  (*Id*.)  The GPW officers advised that the divers would

be returning to the scene that day.  Subsequent to that meeting, McCarthy returned

Elizabeth Fisher's phone call.  (*Id*.)

    Fisher reported to McCarthy that she believed she saw Ms. Romain at St.

Paul's Church the evening of January 12, 2010.  (*Id*.)  Ms. Fisher did not know Ms.

Romain, but thought it was her from the descriptions provided on the news reports

regarding her disappearance.  (*Id*.)  According to Ms. Fisher, Ms. Romain appeared

to be alone at the church service and left through the lakeside doors at

approximately 7:15 p.m.  (*Id*.)  Ms. Fisher described the woman she saw as short,

with a stocky build, brown hair, in her 50's, wearing a dark-colored, possibly brown, "poofy" knee-length coat. (*Id*.) Ms. Fisher reported that her friend, Theresa Brown, who also was at church, may have seen the lights of the missing person's vehicle flash, as somebody was either unlocking or locking it with a key fob. (*Id*.)

Detective McCarthy contacted Theresa Brown the following day, January 15, 2010 at 11:30 a.m. (ECF No. 280-2 at Pg ID 5273.) Ms. Brown indicated that she did not notice Ms. Romain inside the church the evening of January 12, but she saw the Lexus parked in the church driveway near Lake Shore Drive when she left the service. As Ms. Fisher has reported, Ms. Brown saw the lights on the vehicle flash, as if someone was locking or unlocking it with a key fob. (*Id*.) Ms. Brown did not see anyone near the vehicle. (*Id*. at Pg ID 5274.)

Detective McCarthy also followed-up on a telephone tip left by Peter Meldrum with the Grosse Pointe Farms Department of Public Safety. (*Id*. at Pg ID 5273.) Mr. Meldrum reported that he was driving east on Grosse Pointe Boulevard at approximately 11:00 p.m. on January 12, when he saw an older white mini-van, possibly a Dodge Caravan, exiting the driveway between St. Paul's church and the Grosse Pointe Academy.[11] (*Id*.) Mr. Meldrum said the vehicle was traveling at a high rate of speed and entered the eastbound lanes of Grosse Pointe Boulevard,

---

[11] Grosse Pointe Boulevard runs parallel to Lake Shore Drive and driveways from both roads provide access to the academy and church.

causing Mr. Meldrum to have to brake. (*Id*.) The van turned right on an unknown street and was last seen traveling east on Lake Shore Drive passing Moross Avenue. (*Id*.) Mr. Meldrum did not see who was in the van and did not obtain a license plate number. (*Id*.)

On January 15, 2010, Detective McCarthy also returned Martina Nowak's call to the department, but did not reach her. (*Id*. at Pg ID 5274.) McCarthy left Nowack a message to call him. (*Id*.) McCarthy wrote in the case report that Ms. Nowak's earlier message indicated that she may have observed a woman standing near the lake near the time of Ms. Romain's disappearance. (*Id*.)

When she was deposed in this matter on April 27, 2015, Ms. Nowak testified that the person she observed on Lake Shore Road the evening of January 15, 2010, at around 8:30 p.m., "seemed" like a man. (ECF No. 304-4 at Pg ID 7235, 7239.) Ms. Nowak described the individual as probably around six feet tall, with a slim build. (*Id*. at Pg ID 7235) According to Ms. Nowak, she initially called the phone number provided on the news reports regarding Ms. Romain's disappearance and told the person that she saw a man dressed in all black, taller, average build, standing on the lake side of the road, and that he looked like he was crossing over. (*Id*. at Pg ID 7237, 7262.) The person with whom she spoke directed her to call the Grosse Pointe Woods Department of Public Safety, which was taking over the investigation. (*Id*. at Pg ID 7237-38.) Ms. Nowak testified that she eventually

spoke to someone at the department and shared the same information.  (*Id*. at 7238-39.)

On January 15, 2010, Detective McCarthy also attempted to reach Cheryl Solar, who was believed to have attended the St. Paul's Church service the night Ms. Romain disappeared and seen Ms. Romain's car.  (ECF No. 280-2 at Pg ID 5274.)  Later that afternoon, at Chief Jensen's request, Detectives McCarthy and Rosati met with William (Bill) Matouk, Ms. Romain's brother, at his business in Grosse Pointe Woods, Woods Wholesale Wine.  (*Id*.)  After providing an update of their investigation, the detectives asked Bill Matouk if he had any information to assist in their search for Ms. Romain.  (*Id*.)

Bill Matouk informed the officers that his and Ms. Romain's brother, John Matouk, and Michelle Romain were suspicious regarding Ms. Romain's disappearance and did not think it was suicide or an accident.  (*Id*.)  Bill also indicated that Michelle and John mentioned that Ms. Romain said if she ever turned up missing to investigate her husband, David Romain, or cousin, Timothy Matouk.  (*Id*.)  Bill told the officers he did not think either man would harm Ms. Romain and that if foul play was involved, it probably was related to his brother John's legal problems.  (*Id*.)  Bill also told the officers that Ms. Romain stopped by his store and his home a few days after January 1, to wish him and his family a

happy new year.  (*Id*.)  Bill was surprised by the unannounced visits from his
sister.  (*Id*.)

In the days that followed Ms. Romain's disappearance, the Grosse Pointe
Farms Department of Public Safety received other "tips" about the incident.  On
January 17, 2010, PSO Trupiano took a statement from David Grant, who reported
that at around 6:45 or 7:00 p.m. on January 12, he saw a heavy set woman wearing
a dark color trench coat standing on the north side of Lake Shore Drive at St.
Paul's Church.  (ECF No. 280-2 at Pg ID 5276.)  Grant stated that she was staring
out into the water.  (*Id*.)

On January 18, 2010, Paul Hawk came to the GPF Department of Public
Safety and met with Chief Jensen and Detective McCarthy.  (ECF No. 280-14 at
Pg ID 5504.)  Hawk reported that he was driving on Lake Shore Road in the area
of St. Paul's Church on January 12, when he observed two vehicles stopped on the
lakeside (i.e. eastbound lanes).  (*Id*.)  Hawk indicated that the vehicles were in the
right or curb lane.  (*Id*.)  Hawk also saw a woman sitting on the breakwall.  (*Id*.)

When Detective McCarthy asked Hawk when on January 12 this occurred,
Hawk said he was not sure of the exact time, but that it was mid to late afternoon
and light outside.  (*Id*.)  Detective McCarthy did not believe the woman Hawk saw
was Ms. Romain based on the timing, but gave him a witness statement to fill out
and return.  (*Id*.)  Detective McCarthy testified that he did not include Hawk's

statement in the case report because he did not think the information was relevant to Ms. Romain.  (*Id.*)

Detective McCarthy subsequently received the written report Mr. Hawk returned to the police station.  (*Id.*)  In that report, dated January 19, 2010, Mr. Hawk indicated that he went to Farms Market and near dusk, while driving home, saw a woman sitting on the edge of the breakwall across from St. Paul's Church. (ECF No. 298-9.)  Mr. Hawk described the woman as wearing black clothing and having dark hair.  (*Id.*)  Mr. Hawk wrote that two vehicles, one dark (navy blue) and the other of unknown color, were parked in the right lane and impeding traffic. (*Id.*)

Mr. Hawk wrote that as he passed the vehicles, he saw two men.  (*Id.*)  He described the first as Caucasian, over 6 feet tall and about 240 or more pounds. (*Id.*)  Mr. Hawk described the second man as having darker features, 6 feet or under, and weighing 200 pounds or less.  (*Id.*)  He stated that both men were wearing long dress coats.  (*Id.*)

On June 25, 2012, two and a half years after Ms. Romain's disappearance, Mr. Hawk filed a property damage complaint at the Grosse Pointe Woods Department of Public Safety regarding a splotch of tar he found on the side-view mirror of his car, which resembled a hawk.  (ECF No. 274-9.)  When he made the report on June 25, Mr. Hawk told a department employee that he was a witness in

the Grosse Pointe Farm's Romain-Matouk murder and he thought someone put the tar on his car to send him a message to remain quiet. (*Id*. at Pg ID 4811, 4812.) The matter was forwarded to Grosse Pointe Woods Detective Anthony Chalut for follow-up. (*Id*. at Pg ID 4811.)

On January 26, Detective Chalut contacted Grosse Pointe Farms Lieutenant Rosati regarding Mr. Hawk. (*Id*.) Rosati told Chalut that he was aware of Mr. Hawk and that Hawk made a statement regarding what he witnessed on January 12, 2010. (*Id*. at Pg ID 4811-12.) Detective Chalut then interviewed Mr. Hawk. (*Id*. at Pg ID 4812.) During this interview, Mr. Hawk relayed what he witnessed the night of Ms. Romain's disappearance. (*Id*.) Mr. Hawk told Detective Chalut that when he passed the two men and woman on Lake Shore Drive the night of January 12, 2010, one of the men placed his hand in his pocket, as though reaching for a gun. (*Id*.) Chalut noted that Mr. Hawk did not mention the man reaching for a possible weapon in his GPF written statement. (*Id*.)

During their conversation, Mr. Hawk stated that he went to the Michigan State Police and FBI regarding what he saw the night of January 12, 2010, because no one at the GPF Department of Public Safety ever called him back. (*Id*.) Detective Chalut wrote in his report that he explained that the investigating agency is responsible for recontacting witnesses if they deem it necessary and that this seemed to upset Mr. Hawk. (*Id*.) Detective Chalut further explained that, in his

opinion, Lieutenant Rosati did not find Mr. Hawk to be a credible witness due to inconsistencies in his statements compared to known facts in the case. (*Id*.) In a June 19, 2014 affidavit Plaintiff submits in response to Defendants' motions, Mr. Hawk states that Detective Chalut asked him if he could positively identify the men he saw on January 12, 2010. (ECF No. 288-1 at Pg ID 5714.) Mr. Hawk provides that when he responded "yes," Detective Chalut "became very aggressive and hostile, and accused [him] of giving false information to the FBI." (*Id*.)

In the same affidavit, Mr. Hawk states that he was driving from the Farms Market between 7:30 and 8:00 p.m. when he observed what he reported witnessing on Lake Shore Road on January 12, 2010. (*Id*. at Pg Id 5713.) Mr. Hawk explains that when he met with the GPF police officers in 2010, he estimated the time he was passing St. Paul's Church based on his belief that the market closed at 7:00 p.m., when it in fact closed at 8:00 p.m. (*Id*. at Pg ID 5714.) Mr. Hawk further describes that while approaching St. Paul's Church, he observed what appeared to be a heavyset woman with dark hair, dressed in all black clothing, sitting on the breakwall of Lake St. Clair. (*Id*. at Pg ID 5713) He describes her as motionless and slightly slumped over and writes that he immediately became concerned and suspicious. (*Id*.) Mr. Hawk relates that two vehicles were parked in the lane closest to the lake and describes one as a black or dark blue four-door sedan, possibly a Ford Crown Victoria model, and the second as a silver Lexus SUV.

(*Id.*)  Mr. Hawk further provides that the dark blue sedan was a municipal vehicle, with "BHP" as the first three characters of the license plate.  (*Id.*)

In this affidavit, Mr. Hawk additionally states that as he approached the two vehicles, he observed two men standing near each of the cars.  (*Id.*)  He described the first as Caucasian, over six feet tall, and approximately 240 or more pounds. (*Id.*)  He describes the second man as approximately six feet tall, weighing approximately 200 or less pounds.  (*Id.*)

Mr. Hawk further states that as he approached the vehicles to ask the men what they were doing, the larger man reached into his inner coat pocket as if he was going to pull something out, but then quickly pulled his hand out of his jacket and put it in his outer pocket.  (*Id.*)  Mr. Hawk provides that the man then motioned for him to drive through.  (*Id.*)

In this June 19, 2014 affidavit, Mr. Hawk writes that he met with officers at the GPF Department of Public Safety for approximately forty minutes on the morning of January 18, 2010, to relay what he saw and turned in a written statement at the officers' request the following day.  (*Id*. at Pg ID 5713-14.)  He subsequently contacted Plaintiff's counsel when he read an article about a FOIA lawsuit filed by Ms. Romain's family.  (*Id*. at Pg ID 5714.)  Mr. Hawk writes that after seeing a photograph of Timothy Matouk, he can identify him "with absolute

certainty" as one of the two men he saw on the side of the road on January 12, 2010. (*Id*. at Pg ID 5715.)

On January 19, 2010, the Grosse Pointe Farms Department of Public Safety closed its investigation concerning Ms. Romain's disappearance due to the transfer of the matter to Grosse Pointe Woods. (*Id*. at Pg ID 5275.)

On January 14, 2010, the day after GPF had requested that GPW continue the investigation concerning Ms. Romain's disappearance, Director Pazuchowski met with Michelle Romain. (ECF No. 274-5 at Pg ID 4613.) Pazuchowski discussed the sequence of events with Michelle and her family's suspicions concerning Ms. Romain's disappearance. (*Id*.) Pazuchowski also contacted Grosse Pointe Farms Detective McCarthy to obtain details concerning GPF's investigative efforts. (*Id*.) Director Pazuchowski wrote that he thought it was speculation and assumption that Ms. Romain was in the water and that GPW would focus on interviewing and following up on any tips it received. (*Id*.)

Thereafter, Director Pazuchowski sent the two police departments' case reports to Crime Stoppers of Michigan, and confirmed their receipt. (*Id*. at Pg ID 4592.) Crime Stoppers informed Pazuchowski that it would quickly include a report about Ms. Romain's disappearance on its website and prepare a poster advising people to contact either police department with information concerning the case. (*Id*.)

The Grosse Pointe Woods Department of Public Safety also investigated Ms. Romain's cell phone records and bank accounts to determine if they contained information relevant to the investigation. (*See, e.g.*, ECF No. 274-5 at Pg ID 4594.) Officers also received documents and information from Michelle Romain and executed search warrants for Comerica Bank, Chase Bank, and Verizon Wireless. (*Id.* at Pg ID 4606, 4608.) They also investigated the post office box that Ms. Romain had, but closed, because someone gained access to it. (*Id.* at 4606, 4611.) A manager at the location where Ms. Romain opened her post office box reported that a typing error occurred when the information from Ms. Romain's application was entered into the computer system, resulting in the name of someone who opened a box on the same date being included on her box. (*Id.* at Pg ID 4617.)

On January 13, 2010, GPW Detective John Kosanke received a telephone call from Elizabeth Fisher who reported that she saw Ms. Romain enter St. Paul's Church the night before at around 7:05 p.m. (ECF No. 274-5 at Pg ID 4585.) Ms. Fisher indicated that Ms. Romain sat in back and that her body language while walking indicated she was depressed. (*Id.*) Specifically, Ms. Fisher described that Ms. Romain walked slowly and in a slumped position. (*Id.*) According to Ms. Fisher, the service lasted until 7:20 p.m. and she saw Ms. Romain leave the church. (*Id.*)

Also on January 13, Ms. Nowak called the GPW Department of Public Safety to report seeing a person on Lake Shore Drive at 8:30 p.m. the previous evening. (*Id*. at Pg ID 4587.) Ms. Nowak indicated that the person was dressed in all black clothing and was standing on the property adjacent to the lake, facing the road near St. Paul's church. (*Id.*) According to the report entered by GPW employee Agnes Burcar, Ms. Nowak reported being unsure if the person was a male or female. (*Id*.)

On January 18, 2010, GPW Lieutenant Keith Waszak contacted Ms. Fisher to obtain more detail about what she observed at St. Paul's Church the night of Ms. Romain's disappearance. (ECF No. 274-5 at Pg ID 4599.) Ms. Fisher provided that she was at St. Paul's Church for a service that began at 7:00 p.m., and that shortly before it started, she saw a woman matching Ms. Romain's description enter the church. (*Id*.) Ms. Fisher stated that the woman left at the end of the service, with the rest of the attendees. (*Id*.) When asked if she saw Ms. Romain in the parking lot or near a vehicle, Ms. Fisher indicated that she parks in the lot in the rear of the church and not in the driveway. (*Id*.) When Lieutenant Waszak asked Ms. Fisher if she heard a car alarm, she stated that it was her friend who heard it, but it was not an alarm like when someone activates the panic button or a car is being broken into. (*Id*.) Ms. Fisher explained that it was two audible chirps, like when someone locks the car doors. (*Id*.)

Lieutenant Waszak also followed up with Ms. Nowak about what she reported seeing while driving on Lake Shore Drive the night of January 12. (*Id.*) Ms. Nowak provided that she saw a person wearing clothing that looked to be all black standing on the lake side of the road and not moving. (*Id.*) Ms. Nowak indicated that this was at 8:30 p.m. (*Id.*)

On January 18, 2010, Lieutenant Waszak and Director Pazuchowski also interviewed Ms. Romain's husband, David Romain, at his home. (ECF No. 274-5 at Pg ID 4601.) In addition to providing that he, Ms. Romain, and their children spent January 12 in court proceedings involving their black mold case, Mr. Romain indicated that he went to dinner later with his daughters and a cousin, Frank Lufty. (*Id.*) Mr. Romain told the officers that he went directly home after dinner, went to sleep, and then was awakened by a call from his son, Michael, who said that the police were over and something had happened to Ms. Romain. (*Id.*) When asked what he thought about her disappearance, Mr. Romain stated that he did not think Ms. Romain's brother John had anything to do with it, but he speculated that there may be someone out to get to John. (*Id.* at Pg ID 4601-02.) The officers asked Mr. Romain to provide his bank account information, which he dropped off at the department on January 19 and 27, 2010. (*Id.* at 4606, 4617.) Mr. Romain also stated that he would provide the officers with his cell phone records. (*Id.* at 4617.)

The Grosse Pointe Woods Department of Public Safety asked the Michigan State Police to administer a polygraph test to David Romain. (ECF No. 274-7 at Pg ID 4739-40; ECF No. 274-3 at Pg ID 4523.) Lieutenant Waszak and Detective Pazuchowski were present during the polygraph and received a verbal report of the results, but not a written report. (*Id.*) Lieutenant Waszak recalled that the MSP polygraph operator concluded that Mr. Romain was being truthful regarding Ms. Romain's disappearance. (ECF No. 274-3 at Pg ID 4523.) Detective Pazuchowski testified that Mr. Romain did not pass his polygraph test, but that the polygraph operator believed this may have been due to questions posed to Mr. Romain about a possible affair he had or another woman. (ECF No. 274-7 at Pg ID 4740.)

When Waszak and Pazuchowski interviewed the Romain children the following day, they confirmed their father's version of the events on January 12, 2010. (*Id.* at 4602.) Michael told the officers that he did not believe any family was directly involved in his mother's disappearance, but he was concerned that someone might be after John Matouk. (*Id.*) Michelle repeated her belief that her father, Tim Matouk, Bill Matouk, or someone after John Matouk may have had something to do with her mother's disappearance. (*Id.*) Michelle told Lieutenant Waszak and Director Pazuchowski that she found it suspicious that her father and Tim Matouk were in a closed door meeting with Bill Matouk at Bill's store on January 16, 2010, which Michelle learned about from her cousin, Anthony

("Tony") Pipia. (*Id.*) Michelle was not able to provide the officers with any information on why Bill, Tim, or David would be involved in Ms. Romain's disappearance, unless it was to make John Matouk look bad and pin it on him. (*Id.*)

Lieutenant Waszak interviewed Mr. Pipia at the GPW Department of Public Safety on February 8, 2010. (*Id.* at Pg ID 4625.) According to the department report, Mr. Pipia did not have information to assist in the investigation. (*Id.*)

GPW officers did not interview Tim Matouk or Bill Matouk. At the time of Ms. Romain's disappearance, Tim Matouk was a police officer in Harper Woods and Bill Matouk owned a business where many officers were customers. Detective Pazuchowski felt that this created a conflict of interest for his department and it was better to call the state police to investigate them. (ECF No. 274-7 at Pg ID 4747, 4749.) Detective Pazuchowski testified that he asked the Michigan State Police to administer polygraph tests to Tim and Bill, but they chose not to submit to a polygraph. (*Id.* at 4742.) Detective Pazuchowski believes he spoke with Detective Tawana Powell at the MSP. (*Id.* 4743.)

When she was deposed in this matter, Detective Powell confirmed that at some point in 2010, her superiors summoned her to go to the GPW Department of Public Safety and speak with Detective Pazuchowski regarding the Romain case. (ECF No. 298-2 at Pg ID 6039.) According to Detective Powell, Pazuchowski

asked MSP for assistance with the investigation, specifically to interview Tim Matouk and another family member. (*Id*. at Pg ID 6039-40.) Detective Powell recalled that GPW was asking MSP to conduct the interviews because of "some type of perceived conflict of interest[.]" (*Id*. at Pg ID 6040.) She also recalled that Detective Pazuchowski said something to the effect that the interviews were "to clear them." (*Id*.) Detective Powell testified that she responded: "We don't clear people." (*Id*.)

After meeting with Detective Pazuchowski, Detective Powell reported to her boss, Darryl Hill, that the assistance GPW was requesting was not something they could do. (*Id*. at Pg ID 6040, 6042) As Detective Powell explained during her deposition:

> Usually, when we are asked to interview somebody, we are a part of the case. Just to come out cold, when I say cold, that means having no knowledge of the case, just to come out cold and interview. As a law enforcement investigator myself, you come to me and say, hey, can you interview this person. It doesn't cease—that's not the only function. What has to happen, especially in a homicide or a missing person, you need to read the file. You need to have some knowledge of it. I can't just go—you tell me this person said this happened, this person said that happened and I go sit down with him, did you do it? I mean, I have to establish questions.
>
> I've got to establish a ground for questioning people, you know, and Pazuchowski did. He said this is the file. You can read it, you can look at it. However, I don't clear people. No matter what I do and look at this file and question somebody. I don't clear people. So I needed to

> get clarification from my boss as to what are we doing.
> Knowing that I was asked to assess the case, I was never
> going to be investigating the case. I was just assessing
> the case to see what resources MSP could provide to
> assist them and I was going to report back to my boss,
> there are the resources, a review of the file, I feel like
> blah, blah, blah, blah, blah. You know, it was going to
> be like that.

(*Id*. at 6041-42.) Detective Powell prepared an email for Hill summarizing what

Pazuchowski was requesting and her assessment and left it to her superior to

communicate back to Detective Pazuchowski. (*Id.* at Pg ID 6040, 6042) Powell

testified that if Pazuchowski's use of the term "clear" was just a misuse, she

believed he could clear that up with her boss. (*Id*. at Pg ID 6042.) When asked if

MSP eventually interviewed Tim Matouk and the other family member, Detective

Powell said no, because there was no other dialogue beyond that. (*Id*. at Pg ID

6040.)

At some point in time, Ms. Romain's family told GPW officers about Ms.

Alt's report of seeing a suspicious white Mercedes SUV in the Grosse Pointe

Academy lot between 7:30 and 8:00 p.m. the night Ms. Romain disappeared. (ECF

No. 274-5 at Pg ID 4581.) They also gave the officers the names of several

individuals who attended services at St. Paul's Church that evening: Mr. Fisher,

Annette Eusenva, and Theresa Brown. (*Id*. at Pg ID 4581-82.) Detective Kosanke

reached out to those individuals. (*Id*. at Pg ID 4582.) Ms. Eusenva told Detective

Kosanke that she did not know Ms. Romain and did not see anyone at services that

she did not recognize. Ms. Brown advised that she did not see Ms. Romain in church, but Celest Herrity, who was there, may have. (*Id.*) Detective Kosanke contacted Ms. Herrity, who also reported that she did not see Ms. Romain in church.

At the request of Ms. Romain's children, Mary Louise Orsini came to the GPW Department of Public Safety to provide a written statement on January 19, 2010. (ECF No. 304-2.) Ms. Orsini told the officer with whom she met that she went to St. Paul's Church at 5:30 p.m. on the day Ms. Romain went missing. (ECF No. 274-5 at Pg ID 4604.) Because of a large gathering at the school, Ms. Orsini said that she was forced to park her car along the curb on the driveway to Lake Shore Drive. (*Id.*) Ms. Orsini indicated that when she left at approximately 7:30-7:45 p.m., there were no cars parked in front or behind her vehicle and no cars in the lot. (*Id.*)

Lieutenant Waszak followed up with Ms. Orsini on January 20, 2010, asking her to clarify her written statement and possibly provide additional information. (*Id.* at Pg ID 4608.) With respect to her statement that there were no cars in front or behind her vehicle when she left St. Paul's Church, Ms. Orsini explained that there were no other vehicles parked on the drive that leads to and from Lake Shore. (*Id.*) Her vehicle was the only car on the drive. (*Id.*) Ms. Orsini indicated that there may have been cars in the parking lot, as there was a function at the academy

that evening.  (*Id*.)  Ms. Orsini gave Lieutenant Waszak additional names of people at the church that evening, which included the Fishers and Cecile Herrity.  (*Id*.)  Lieutenant Waszak left a message with those individuals.

Lieutenant Waszak spoke with Ms. Herrity on January 21, 2010.  (*Id*. at Pg ID 4012.)  As she previously reported, Ms. Herrity stated that she did not know Ms. Romain and does not recall seeing her in the church.  (*Id*.)  Ms. Herrity provided that she was parked on the driveway and when she left—which she believed was at around 7:25 p.m.—she could recall seeing only a black van parked about three parking spaces ahead of her car in the driveway.  (*Id*.)

Lieutenant Waszak spoke with Ralph and Elizabeth Fisher the following day, and they did not provide any more information than they previously shared.  (*Id*. at Pg ID 4615.)  Grosse Pointe Woods officers interviewed additional individuals, including several of Ms. Romain's friends and co-workers, but received no information from them pertinent to their investigation.

On March 20, 2010, fishermen found a body in the Detroit River near the Livingston Channel, which is in Amherstburg, Ontario, Canada, and the Canadian Coast Guard responded to the area.  (ECF No. 280-2 at Pg ID 5278, 5279.)  The Grosse Ile Police Department received this information and passed it along to the GPF Department of Public Safety.  (*Id*.)  GPF Detective McCarthy called the Ontario Provincial Police and spoke with Detective Chris Coene, who indicated

that the body was believed to be a female.  (*Id*.)  Detective McCarthy advised

Coene of the missing person's report and a description of Ms. Romain and

provided that GPF detectives would be responding to the area.  (*Id*.)  Coene

requested copies of the missing person reports to assist them in their investigation.

(*Id*.)  When asked during his deposition in this matter why GPF did not refer the

Canadian authorities to GPW, Detective Rosati testified that GPF knew no GPW

detectives worked on Saturday.  (ECF No. 280-19 at Pg ID 5573.)

At 10:30 a.m., Detectives McCarthy and Rosati left for Amherstburg,

Ontario.  (ECF No. 280-2 at Pg ID 5278.)  En route, they received a call from

Detective Coene who stated that the body matched Ms. Romain's description.  (*Id*.)

When they arrived at the Canadian Coast Guard Base, Detectives McCarthy and

Rosati made a tentative identification as the body and clothing matched Ms.

Romain's description.  (*Id*.)  They contacted Michelle Romain and Bill Matouk to

inform them of the discovery.  (ECF No. 280-19 at Pg 5568.)  Rosati also notified

Grosse Pointe Woods Detective Pazuchowski to inform him of this development.

(*Id*. at Pg ID 5279.)  The body was transferred to the Coroner for the Province of

Ontario for an autopsy.  (*Id*. at Pg ID 5278.)

Copies of the GPF Department of Public Safety's reports were forwarded to

Detective Coene.  (*Id*. at Pg ID 5279.)  Detective Coene indicated that he would

forward his reports to GPF.  (*Id*.)

The Canadian coroner, Dr. Marven Oxley, performed an autopsy on March 22, 2010. (*Id*.; ECF No. 280-21.) Dr. Oxley noted in his autopsy report that neither United States nor Canadian police suspected foul play and that while Ms. Romain's entry into Lake St. Clair was not witnessed, there was some circumstantial evidence that she may have intended to take her life. (*Id*. at Pg ID 5621.) The report noted paranoid psychosis (presumed).[12] (*Id*. at Pg ID 5620.) Dr. Oxley nevertheless wrote that he found insufficient evidence that Ms. Romain intended to take her life. (*Id*. at Pg ID 5621) Dr. Oxley concluded that the cause of death was drowning and the manner of death undetermined. (ECF No. 280-21 at Pg ID 5621.) The body was released to the Macomb County Medical Examiner's Office, where Dr. Daniel Spitz conducted a separate autopsy on March 23, 2010. (ECF No. 280-22.) Dr. Spitz reached the same conclusions as Dr. Oxley. (*Id*. at Pg ID 5635.) He noted that "the lack of significant injuries makes homicide less likely" and the lack of an explanation for why Ms. Romain would be at the water's edge made "[a]n accidental manner of death … quite unlikely." (*Id*.)

At Michelle Romain's request, a third autopsy was performed at the University of Michigan by Dr. Jeffrey Jentzen on March 25, 2010. (ECF No. 280-

---

[12] During their depositions, Detectives McCarthy and Rosati testified that they did not know how the Canadian authorities obtained the information concerning Ms. Romain's mental health that was in the Canadian coroner's report and purportedly a supplemental report from the Ontario Provincial Police. (ECF No. 280-19 at Pg ID 5568; ECF No. 280-14 at Pg ID 5498-99.) However, the information was in the GPF police report shared with Detective Coene.

23.) Dr. Jentzen opined that the cause of death was most likely freshwater drowning and the manner of death undetermined. (*Id*. at Pg ID 5637.) He noted no significant trauma, but contusions on the left upper arm. (*Id*.)

With Ms. Romain's body located, the Grosse Pointe Woods Department of Public Safety closed its missing person file but kept the investigation of her disappearance open, but inactive. (ECF No. 274-7 at Pg ID 4783-84.) Director Jensen testified that the Grosse Pointe Farms Department of Public Safety found insufficient evidence to reach an official conclusion regarding the cause of Ms. Romain's disappearance and/or death. (ECF No. 280-2 at Pg ID 5257.) He further testified that the case remains open and that new credible evidence as to the cause of her disappearance or death would be thoroughly investigated if presented. (*Id*. at Pg ID 5258.)

## V.    Applicable Law and Analysis

### A.    Statute of Limitations

The Grosse Pointe Woods Defendants first argue in support of their motion for summary judgment that Plaintiff's §§ 1983 and 1985 claims are barred by the applicable three-year statute of limitations. They contend that Michelle Romain was involved in the police investigation from the night of Ms. Romain's disappearance and knew or had reason to know of the causes of action now pled as of the summer of 2010—when Michelle retained her own medical examiner to

45

perform an autopsy of Ms. Romain's body or hired a private investigator to uncover the circumstances surrounding her death. The GPW Defendants do not extrapolate on their argument to identify the specific information Michelle knew or should have known that would have enabled her to pursue the current civil rights claims earlier.

In fact, Plaintiff argues in response that she did not obtain the information necessary to file the current action until February 2012, when Michelle Romain prevailed in her FOIA lawsuit filed against Grosse Pointe Woods. While Michelle previously was suspicious concerning her mother's disappearance, Plaintiff contends that these suspicions were only confirmed upon receipt of those records.

The GPW Defendants do not take up their statute of limitations argument in their reply brief. In light of the feebleness of their initial argument and Plaintiff's response, the Court concludes that the statute of limitations is not a bar to Plaintiff's civil rights claims.

## B. 42 U.S.C. § 1985 (Conspiracy)

The GPW Defendants argue that Plaintiff's § 1985 claim is subject to dismissal because she fails to allege discrimination based on race, gender or other class-based invidiously discriminatory animus. They further argue that under Sixth Circuit precedent, Plaintiff cannot rest her § 1985 claim on a "class-of-one" theory. The GPF Defendants contend that even under a class-of-one claim, Plaintiff's

§ 1985 claim fails because there is no evidence that Defendants conspired to treat Ms. Romain's case differently in all relevant and material respect from others similarly situated.

The Court is at a loss for why these defendants devote such a significant portion of their summary judgment briefs arguing the availability and/or viability of a § 1985 claim under a class-of-one theory, when this Court already has rule that it would be futile for Plaintiff to add such a claim.  (ECF No. 313.)  As the Court expressly concluded in its decision denying Plaintiff's motion to file a third amended complaint, "the Sixth Circuit has held that a class-of-one equal protection claim cannot be the basis of a § 1985 civil conspiracy claim."  (*Id*. at Pg ID 7463, citing cases.)  The Court rejected Plaintiff's reliance on *Umani v. Michigan Department of Corrections*, 432 F. App'x 453 (6th Cir. 2011), to demonstrate that such a claim is viable.  (*Id*.)  This is the same case Plaintiff now relies upon in response to Defendants' summary judgment arguments.  (ECF No. 298 at Pg ID 6014-15.)  As this Court previously stated, the plaintiff's class-of-one claim in *Umani* was independent of his § 1985 conspiracy claim and the Sixth Circuit evaluated the two claims separately.  (ECF No. 313 at Pg ID 7463.)

Plaintiff does not attempt to show that Defendants conspired to violate Ms. Romain's civil rights based on "some racial or other class-based invidiously discriminatory animus."  *Umani*, 432 F. App'x at 461 (stating what the plaintiff

had to show to prove his § 1985 claim).  As such, this Court concludes that Defendants are entitled to summary judgment with respect to Plaintiff's § 1985 claim.

### C.     42 U.S.C. § 1983 – State Created Danger

In order to establish liability under § 1983, the plaintiff must demonstrate the "depriv[ation] of a right secured by the Constitution or laws of the United States … by a person acting under color of state law."  *Gregory v. Shelby Cty., Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978))). Defendant Matouk argues that he is entitled to summary judgment with respect to Plaintiff's § 1983 claim because he was not acting in his capacity as a Harper Woods police officer when allegedly engaging in the conduct set forth in the complaint.  "Private persons jointly engaged with state officials in a deprivation of civil rights are acting under color of law for purposes of § 1983[,]" however. *Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985) (citing cases).  Plaintiff alleges that Matouk was engaged in a civil conspiracy with the defendant Grosse Pointe Farms and Grosse Pointe Woods officers to deprive Ms. Romain of her constitutional rights.  Thus, *if* Plaintiff can establish a conspiracy between Tim

Matouk and any state actor to deprive Ms. Romain of her federal rights, he can be held liable under § 1983.[13]

Establishing a conspiracy under § 1983 requires proof "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiff[] of [her] constitutional rights, and (3) an overt act was committed." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy." *Hooks*, 771 F.2d 944. Further, "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id*.

Plaintiff's § 1983 claim is premised on her assertion that Defendants committed affirmative acts which created a risk that Ms. Romain would be exposed to an act of violence by a third party. (ECF No. 93 at Pg ID 1132.) Plaintiff states in the Second Amended Complaint: "The individually named Defendants, acting in concert with each other, acted purposely with the intent of creating a danger to JoAnn by making it known to Killer John Doe that they would immediately cover up the murder and rule it a suicide." (*Id*.) This alleges a violation of Ms. Romain's substantive due process rights under the Fourteenth Amendment.

---

[13] Defendants' counsel argued at the motion hearing that prior to responding to their summary judgment motions, Plaintiff never asserted a conspiracy claim under § 1983 (as opposed to § 1985). This Court does not agree. (*See, e.g.*, 2nd Amen. Compl. ¶ 74, ECF No. 93 at Pg ID 1132.)

As a general rule, "[t]he Due Process Clause does not require the State to protect the life, liberty, and property of its citizens against invasion by private actors[.]'" *Koulta v. Merciez*, 477 F.3d 442, 445 (6th Cir. 2007) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). Two exceptions to this rule grew out of *DeShaney*. The first, which was expressly recognized by the *DeShaney* Court, arises "when the State takes a person into its custody and holds him there against his will." *DeShaney*, 489 U.S. at 199-200. In that instance, "the Constitution imposes upon [the State] a corresponding duty to assume some responsibility for [the person's] safety and general well-being." *Id*. Plaintiff does not allege that Ms. Romain was ever in state custody and that this "special relationship" exception applies.

Plaintiff does allege, however, that this case falls within the second exception: a "state-created danger." To prevail under a state-created danger theory, Plaintiff must show the following three things:

> "'(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.'"

*Koulta*, 477 F.3d at 445 (quoting *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir.

2003))). "The ultimate question in determining whether an affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it." *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 854 (6th Cir. 2016) (citing *Jasinski v. Tyler*, 729 F.3d 531, 539 (6th Cir. 2013)).

A failure to act will not satisfy the first element of the state-created danger test. *Koulta*, 477 F.3d at 445; *Sheets v. Mullins*, 287 F.3d 581, 588-89 (6th Cir. 2002) (failing to pursue and investigate a domestic-disturbance call was not an affirmative act). Recognizing that it is sometimes difficult to distinguish between action and inaction, the Sixth Circuit focuses on "whether [the victim] was safer before the state action than he [or she] was after it." *Cartwright*, 336 F.3d at 493. "If the claimant thus cannot identify conduct by the state which either created or increased the risk of harm to which [the victim] was exposed, [Sixth Circuit] precedent[] instruct[s courts] to consider the [defendants'] conduct as falling on the inaction side of the line." *Koulta*, 477 F.3d at 446 (internal quotation marks and citations omitted, brackets added).

In *DeShaney*, the Supreme Court found no state created action because the state's temporary custody of a child before returning him to his dangerous father did not increase the child's risk of harm because the state "placed him in no worse position than that in which he would have been had it not acted at all." 489 U.S. at 201. In *Stiles*, the Sixth Circuit held that school officials did not increase the risk

of harm to a student by previously failing to punish or insufficiently punishing his assailants or by ignoring a dangerous situation. 819 F.3d at 854-55 ("Failing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [the Township's chief of police] are plainly omissions rather than affirmative acts."). In *Koulta*, the Sixth Circuit found no affirmative act exposing police officers to liability under a state-created danger theory where the officers had encountered a drunk driver in her car on her ex-boyfriend's driveway minutes before she ran a red light and killed the plaintiff's decedent, and the officers ordered the drunk driver to leave without administering a Breathalyzer test or otherwise determining the extent of her inebriation. 477 F.3d at 446.

To prevail on her state-created danger theory, Plaintiff must prove more than that Defendants engaged in affirmative acts to conceal the identity of Ms. Romain's alleged killer. In other words, liability cannot be premised on the conclusion provided by Plaintiff's expert, Salvatore Rastrelli, that "the police conduct [in this case] was either an example of gross incompetence or intentional dereliction of duties to cover up the details of [Ms. Romain]'s death." (ECF No. 298-7 at Pg ID 6256.) This is so even if Plaintiff presented evidence to support her theory that Ms. Romain was murdered because she became aware of illegal activity at Bill Matouk's store and that, as "buddies" of Bill, the Defendants covered it

up.[14]  Once Ms. Romain was killed—which the Court will assume for purposes of

deciding Defendants' motions as this is the opinion of Plaintiff's experts—nothing

Defendants did could have created or increased the risk of danger to her.

Defendants' alleged awareness of the danger Killer John Doe posed to Ms.

Romain before she was harmed also does not show an affirmative act that created

the harm or rendered her more vulnerable to danger.  *See Jones*, 438 F.3d at 691

(finding no affirmative act where the defendant officers came upon an illegal drag

race and failed to stop it); *Sheets*, 287 F.3d at 588-89 (finding no affirmative act

where the defendant officer failed to intervene when told of individual's threat to

kill his children when the individual subsequently shot and killed his baby

daughter).  "[I]gnoring a dangerous situation is usually not an affirmative act and,

furthermore, usually cannot increase a preexisting danger."  *Stiles*, 819 F.2d at 855

(citing *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 465-66 (6th Cir. 2006) and

---

[14] As Defendants point out, Plaintiff fails to present any evidence to support her
assertion that Bill Matouk was involved in "plenty of illegal activity" (*see* ECF No.
298 at Pg ID 5970) and she mischaracterizes his relationship with the officers
named in this action to suggest that they were close enough that the officers would
be willing to conceal his involvement in a murder.  During the deposition of Bill
Matouk that Plaintiff offers to demonstrate this close relationship, Plaintiff's
counsel repeatedly tried to get Mr. Matouk to say that he was "buddies" with the
named officers.  (*See e.g.*, ECF No. 298-11 at Pg ID 6507-16, 6582-89.)  What the
deposition testimony reflects is that some of the defendants are or have been
customers at Bill Matouk's store and he was friendly with them, but never
socialized with them.  (*Id.*)  Notably, Defendants challenge the admissibility of this
testimony; however, the Court will assume that it is admissible for purpose of
deciding their motion.

*Jones*, 438 F.3d at 691). As such, even accepting as true Plaintiff's assertion that officers visited the Romain home and contacted the Coast Guard to report Ms. Romain's disappearance before PSO Colombo claims to have started his investigation—thus suggesting that those officers had an earlier warning of the harm to befall her—this does not reflect affirmative conduct creating or increasing the risk of danger to her.[15]

In comparison, the Court believes Plaintiff could survive summary judgment on her state-created danger theory if, as she alleges, Defendants "ma[de] it known to Killer John Doe that they would immediately cover up [Ms. Romain's] murder and rule it a suicide." (ECF No. 93 at Pg ID 1132; *see also* ECF No. 298 at Pg ID 6011.) As the Sixth Circuit recently acknowledged, "[t]here may be scenarios where a state official increases the risk of harm by encouraging a violent actor to do something he would not otherwise have done."[16] *Engler v. Arnold*, 862 F.3d 571, 576 (2017). Nevertheless, Plaintiff presents absolutely no evidence to suggest

---

[15] Notably, Plaintiff has failed to identify the individual who she claims came to the Romain residence at 9:25 p.m. on January 12, 2010. The individual was not any of the defendants and Plaintiff has not identified the individual as an employee of the Grosse Pointe Woods Department of Public Safety. As such, there is no evidence that this individual was even connected to Defendants, much less that the individual conspired with them.

[16] Yet, Plaintiff seems to suggest that Tim Matouk was Ms. Romain's killer and that he would have harmed her regardless of any conduct by Defendants. Specifically, Plaintiff's evidence reflects that Ms. Romain was afraid of Tim Matouk, he threatened he could make her disappear, and Ms. Romain told friends and family that if she disappeared, they should suspect him.

that, before Ms. Romain was harmed, the GPF or DPW Defendants communicated to her killer that they would cover up his actions. Nor does Plaintiff show that these defendants did anything to encourage Ms. Romain's killer. As stated in Section III: "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses …." *Celotex*, 477 U.S. at 323-24. To survive summary judgment, Plaintiff "must be able to show sufficient probative evidence that would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (internal quotation marks and citation omitted); *see also Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989) (holding that proof of a civil conspiracy under § 1983 requires "evidence beyond mere conjecture and speculation that an agreement existed").

In short, Plaintiff fails to present evidence to create a genuine issue of material fact to support her state-created danger claim under § 1983. Even assuming that Defendants botched their investigation of Ms. Romain's disappearance and even assuming that this was done intentionally to conceal the fact that she was murdered and the identity of her killer, such conduct occurred *after* she was harmed.[17] As such, it did not create or increase any risk of harm to

---

[17] Plaintiff's counsel argued at the motion hearing that if Ms. Romain was not killed the night of January 12, 2010, Defendants' actions after she disappeared put her at greater risk of harm. Nevertheless, Plaintiff cannot show that Ms. Romain

Ms. Romain. Further, even if Defendants were aware of the danger to Ms. Romain before she disappeared, ignoring that harm does not reflect an affirmative act supporting liability under their state-created danger theory. While Plaintiff hypothesizes that Ms. Romain's killer was emboldened to act because the officer defendants made it known that they would cover up his actions, she presents no evidence on which a jury could rely to reach this conclusion.

For these reasons, the Court concludes that the police officer defendants are entitled to summary judgment on Plaintiff's § 1983 claim. Absent evidence that these defendants conspired with Tim Matouk, he also cannot be held liable under § 1983.

### D.      42 U.S.C. § 1983 – Municipal Liability

A municipality can be liable under § 1983 only if there is some underlying constitutional violation for which it could be held responsible. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 471 (6th Cir. 2006). In other words, Grosse Pointe Farms and Grosse Pointe Woods may be held liable only "if there is a showing of liability on the part of [their] officials." *Bukowski v. City of Akron*, 326 F.3d 702, 712 (6th Cir. 2003). As such, the Court's determination that Plaintiff fails to create a genuine issue of material fact with respect to her § 1983 claims

---

was not killed that evening. Further, it would be pure speculation for a jury to conclude that Defendants' alleged "sloppy police work" increased any risk of danger to her.

against the individual officers resolves her claim against the municipality defendants as well.

### E.     Wrongful Death

Prior to the filing of their Second Amended Complaint, Plaintiff failed to identify whether her wrongful death "claim" was brought under § 1983 or Michigan law.  In her Second Amended Complaint, however, Plaintiff clearly identifies the claim as being brought under federal law.  (*See* ECF No. 93 at Pg ID 1135.)  Yet, Plaintiff obfuscates the issue in response to the arguments asserted in Defendant Matouk's summary judgment motion by arguing that the form of the complaint is not what matters but whether the substance alleged supports the claim. (*See* ECF No. 298 at Pg ID 593-84.)  When asked to clarify at the motion hearing, Plaintiff's counsel provided that the claim is asserted under federal law against the GPW and GPF Defendants and under state law against Tim Matouk.  Regardless of whether the claim is asserted under § 1983 or Michigan law, however, the Court concludes that it must be dismissed.

As the Court noted in its July 31, 2015 opinion and order granting in part and denying in part the Grosse Pointe Woods Defendants' motion to dismiss, it is irrelevant whether Plaintiff is alleging her wrongful death claim under federal or state law because "wrongful death is not a separate cause of action."  (ECF No. 120 at Pg ID 1859-60 n.3, citing *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 598-60

(6th Cir. 2006) and *Kane v. Rohrbacher*, 83 F.3d 804, 805 (6th Cir. 1996).)
Instead, "wrongful death" provides the damages available once a civil rights or tort
violation is found that leads to death. (*Id*.) Thus, to prevail on her wrongful death
"claim", Plaintiff must show that Defendants violated Ms. Romain's civil rights in
violation of § 1983 or engaged in some tort causing death.

The Court has concluded that Defendants are entitled to summary judgment
with respect to Plaintiff's § 1983 claim. Therefore, to the extent Plaintiff's
wrongful death claim is brought under the federal civil rights statute, Defendants
also are entitled to summary judgment with respect to that claim. Plaintiff does not
allege a separate underlying tort in this lawsuit. Thus, to the extent she is asserting
a state law wrongful death claim, it also must be dismissed albeit without
prejudice.

In closing, this Court acknowledges that there are disputed facts in this
matter that are very disturbing and to this day remain unresolved. However, the
particular facts in dispute are not material to the Plaintiff's theories of liability, and
as such, do not serve as a bar to summary judgment. Nevertheless, the Court finds
Plaintiff's pursuit of this lawsuit meritorious and is therefore denying Defendants'
requests for attorneys' fees and costs.

Accordingly,

**IT IS ORDERED** that the Grosse Pointe Woods Defendants' motion for summary judgment (ECF No. 274) is **GRANTED**;

**IT IS FURTHER ORDERED** that the Grosse Pointe Farms Defendants' motion for summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Timothy Matouk's motion for summary judgment is **GRANTED** in that, except for Plaintiff's wrongful death claim, all claims against him are dismissed with prejudice. Plaintiff's wrongful death claim against this defendant, only, is dismissed without prejudice.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 7, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, March 7, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager